**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CHRISTOPHER SPEAKES, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>TARO PHARMACEUTICAL INDUSTRIES, LTD., MICHAEL KALB, AND KALYANASUNDARAM SUBRAMANIAN,<br><br>Defendants. | 16-cv-08318-ALC |

**CORRECTED AMENDED CLASS ACTION COMPLAINT**

**BERNSTEIN LIEBHARD LLP**
Stanley D. Bernstein
Michael S. Bigin
Joseph R. Seidman, Jr.
10 East 40th Street
New York, NY 10016
Telephone: (212) 779-1414

Date: June 15, 2017

# TABLE OF CONTENTS

**Page**


JURISDICTION AND VENUE ........ 8

PARTIES ........ 8

SUBSTANTIVE ALLEGATIONS ........ 13

A. Overview of the Generic Drug Market ........ 13

B. How Generic Pharmaceuticals Are Priced ........ 16

1. Taro Conspired to Fix Prices on at Least Seven Drugs With Other Generic Pharmaceutical Companies at Numerous Trade Association Meetings ........ 17

**a.** Clobetasol ........ 18

**b.** Desonide ........ 27

**c.** Fluocinonide ........ 32

**d.** Econozale ........ 38

**e.** Clomipramine ........ 41

**f.** Enalapril ........ 44

**g.** Acetazolamide ........ 47

2. Attendees From Taro at Trade Association Meetings Had the Authority to Raise Prices on Taro's Generic Drugs ........ 48

3. Defendant Kalb Attended Biweekly Pricing Meetings During the Class Period . 49

C. Additional Facts Demonstrating that Taro Fixed Prices on the Drugs ........ 50

1. Markets for the Drugs Are Highly Susceptible To Collusion ........ 50

**a.** High Degree of Industry Concentration ........ 50

**b.** Sufficient Numbers to Drive Competition ........ 51

**c.** High Barriers to Entry ........ 51

**d.** Lack of Substitutes ........ 53

**e.** Demand Inelasticity ........ 56

**f.** High Degree of Interchangeability ........ 57

**g.** Absence of Competitive Sellers ........ 60

**h.** Opportunities for Contact and Communication Among Competitors ........ 60

**i.** Absence of Departures from the Markets ........ 64

**j.** Absence of Competitive Sellers ........ 64

**k.** Size of the Price Increases ........ 64

**l.** Departure from Their Historic Pricing Practices ........ 65

**m.** Reimbursement of Generic Drugs ........ 65

**n.** The Conspirators Acted Against Their Unilateral Self Interest Absent a Cartel ........ 66

**o.** Motive to Conspire ........ 67

D. Taro and Many of Its Conspirators Are the Subject of Extensive Government Investigations ........ 68

1. The DOJ and Congress Are Investigating How Generic Drug Companies, Including Taro, Fixed Prices at Trade Association Meetings ........ 68

2. The DOJ Serves Subpoenas on Taro, As Well As Numerous Conspirators ........ 70

3. The DOJ Action ........ 71

4. The State AG Action ........ 72

5. The DOJ Intervened in Private Antitrust Cases Against Taro, Demonstrating That Taro Is An Important Part of the DOJ Investigation ........ 74

6. The DOJ Intervenes in Another Generic Drug Case ........ 75

7. Propranolol Case Sustained ........ 77

E. There Are 85 Antitrust Suits Against Generic Drug Companies – With 43 Naming Taro as a Defendant ........ 78

F. Defendants' Materially False and Misleading Statements ........ 78

G. Defendants' Misstatements And Omissions Relating To Taro's Sales Figures ........ 85

H. Taro Failed to Disclose the Impact of Illegal Price-Fixing Activity on Reported Revenues ........ 87

I. Taro Discloses that the DOJ is Investigating the Company ........................................... 89

J. The Truth is Revealed ........................................................................................... 90

POST-CLASS PERIOD EVENTS ........................................................................................ 92

ADDITIONAL SCIENTER/FALSITY ALLEGATIONS ....................................................... 92

A. Defendant Kalb Attended Biweekly Meetings Relating to Pricing During the Class Period ........................................................................................................................ 93

B. The Fraud Infected Taro's Core Operations, which Defendants and Analysts Closely Monitored ........................................................................................................... 93

C. Trade Association Meetings Occurred Just Prior to Taro's Price Hikes .......................... 95

D. Taro's Stock Price Increased After the Company Raised Clobetasol Prices .................... 96

E. Taro's Revenues Skyrocketed by 47% Due to Collusion ................................................ 97

F. Taro's Ethics Code Required the Company to Monitor Collusive Behavior ................... 98

G. CEO Subramanian and CFO Kalb's Resignations Are Highly Suspicious ...................... 99

H. The Individual Defendants Were Motivated to Commit Fraud to Increase Their Bonuses and Discretionary Earnings ............................................................................ 100

I. Defendants Signed Sarbanes-Oxley Certifications Attesting that They Personally Supervised Taro's Controls and Procedures ................................................................ 101

LOSS CAUSATION / ECONOMIC LOSS ......................................................................... 102

CLASS ACTION ALLEGATIONS ..................................................................................... 104

PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET ........................................... 106

COUNT I Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder ......................................................................................................... 106

COUNT II Violation of Section 20(a) of the Exchange Act Against the Individual Defendants ........................................................................................................................ 110

PRAYER FOR RELIEF ..................................................................................................... 111

JURY TRIAL DEMANDED ................................................................................................ 111

1. Lead Plaintiff City of Atlanta Firefighters' Pension Fund ("Lead Plaintiff" or "Plaintiff"), by and through its undersigned counsel, alleges the following upon information and belief, except as to those allegations concerning Lead Plaintiff, which are alleged upon personal knowledge. Lead Plaintiff's information and belief are based upon, among other things, Lead Counsel's investigation, which includes without limitation, review and analysis of filings with the United States Securities and Exchange Commission ("SEC"), press releases, news articles, analyst reports, court filings, the Congressional Record, interviews with former Taro employees, and consultation with an economic expert with expertise in evaluating markets for collusive behavior. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

2. This is a securities class action on behalf of all persons who purchased Taro Pharmaceutical Industries, Ltd. ("Taro" or the "Company") common stock on the open market in the United States between July 2, 2014 and November 3, 2016 (inclusive) ("the Class Period"), who were damaged by Defendants' violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934.

3. Taro is an Israeli corporation whose principal business activity is the production, research, development and marketing of pharmaceutical products. Taro operates in Israel and elsewhere through its Israeli, North American, and European subsidiaries, including Taro's United States subsidiary, Taro U.S.A. ("Taro USA"). Taro USA accounted for 90%, 89% and 87% of the Company's consolidated revenue for the years ended March 31, 2016, 2015, and 2014, respectively. *See* Taro's June 19, 2016 20-F at 10. Dermatological drugs – several of which are at issue in this case – are a principal product line of Taro USA.

4. Prices for dozens of generic drugs, including several marketed by Taro, have uncharacteristically risen for no rational reason. This has outraged public officials, payers, and consumers across the country, whose costs for generic drugs have doubled, tripled, or in some cases increased up to 1,000% or more. The growing outrage and public reports of unexplained and suspicious price increases caused the State of Connecticut to commence an investigation in July of 2014, which was followed shortly thereafter by an investigation and litigation by the United States Department of Justice Antitrust Division (the "DOJ").

5. The evidence to date shows that Taro entered into anticompetitive agreements with its competitors in the generic drug market. Taro conspired to fix prices on at least seven of its drugs: Clobetasol, Desonide, Econozale, Fluocinonide, Clomipramine, Acetazolamide, and Enalapril (the "Drugs").

6. Taro conspired with Sandoz,[1] Hi-Tech, Perrigo, Actavis, G&W Laboratories, and Morton Grove Pharmaceuticals to fix prices on Clobetasol cream, ointment, topical gel, and topical solution (the "Clobetasol Conspirators"); with Perrigo, G&W Labs, Sandoz, and Actavis to fix prices on Desonide cream (the "Desonide Conspirators"), with Perrigo, Sandoz, and Teligent (later known as IGI Laboratories) to fix prices on Econozale cream (the "Econozale Conspirators"), with Teva, Actavis, Sandoz, Mayne, and Watson to fix prices on Fluocinonide cream, ointment, gel, and solution (the "Fluocinonide Conspirators"); with Mylan and Sandoz to fix prices on Clomipramine capsules (the "Clomipramine Conspirators"); with Lannett to fix prices on Acetazolamide tablets (the "Acetazolamide Conspirators"); and with Wockhardt, Mylan, Legacy, Sandoz, Oceanside, Northstar, and Teva to fix prices on Enalapril tablets (the "Enalapril Conspirators"). The Clobetasol Conspirators, Desonide Conspirators, Econozale

[1] The Conspirators' full corporate names are identified in the Relevant Non-Party Corporation section herein.

Conspirators, Fluocinonide Conspirators, Clomipramine Conspirators, Acetazolamide Conspirators, and Enalapril Conspirators are collectively referred to as the "Conspirators".

7. The Conspirators coordinated increasing the Drugs' prices. The Drugs' steep price increases each followed closely after meetings between Taro and various Conspirators. For example, right after Clobetasol Conspirators' discussions held at the National Association of Chain Drug Stores ("NACDS") Annual Meeting from April 26-29, 2014 and a Generic Pharmaceutical Association ("GPhA") meeting in June 2014, Taro's Clobetasol prices skyrocketed over 1,500%. Similar patterns exist for the other Conspirators and the other Drugs.

8. The Conspirators used trade association meetings to create illegal agreements to fix prices on the Drugs. Several trade association meetings occurring prior to the Drugs' coordinated price hikes were attended by the same Taro representatives – Michael Perfetto, Taro's President and Chief Commercial Officer, and Ara Aprahamian, Taro's Vice President of Sales and Marketing. Two former senior Taro employees stated that these executives had the authority to, and did, cause pricing changes. Additionally, Defendants were intimately involved in structuring the Drugs' pricing. Taro's former Pricing and Contracts Analyst stated that there were official Taro biweekly Monday meetings where pricing and price changes were discussed, which were attended by, inter alia, Defendant and former-Taro CFO Michael Kalb.

9. An economic expert has found that there is no non-collusive explanation for the Drugs' synchronized price increases – there was no supply shortage, production problem, or sudden increase in demand for these drugs during this period, and no competitor left the market. Moreover, the markets for the Drugs are highly susceptible to collusion: they are dominated by only a few companies, making collusion easy; demand is highly inelastic, *i.e.*, consumers need the Drugs and will pay higher prices for them; there are no reasonable substitutes for the Drugs;

there are high entry barriers for new companies to enter the market; the Drugs were commodity-like products – generic drugs whose only distinguishing factor for purchasers was price; no Drug had a viable substitute; and information sharing and price discovery were common.

10. Taro has reaped enormous profits by fixing prices on the Drugs. In total, Taro has earned approximately $1.54 billion in collusive revenues (less rebates)[2] from its price fixing:

| Drug | WAC (Wholesale Acquisition Cost less discounts) ($m) | WAC (less discounts & rebates) ($m) |
|---|---|---|
| Acetazolamide | 63 | 49 |
| Clobetasol | 956 | 735 |
| Clomipramine | 262 | 202 |
| Desonide | 203 | 156 |
| Econazole | 118 | 91 |
| Enalapril | 123 | 95 |
| Fluocinonide | 276 | 212 |
| Total | 2,001 | 1,540 |

11. Taro's revenue from mid-2013 through 2016 was $3.244 billion and collusive revenue from the Drugs totaled $1.54 billion. Accordingly, Taro's collusive revenues from price fixing the Drugs amounted to over 47% of its revenues.

[2] Collusive revenues are revenues earned on the Drugs, less what would have been earned but for collusion, taking into account rebates, as Taro reports their revenues net of rebates. Taro stated in its 2016 Form 20-F that "[w]hen we recognize and record revenue from the sale of our pharmaceutical products, we record an estimate in the same financial reporting period for product returns, chargebacks, rebates and other sales deductions, which are reflected as reductions of the related gross revenue." *Id*. at 38. Rebates need to be factored in to determine a true "net sales" number because Taro's revenues will be reduced by the amount in rebates it pays out. Rebates are non-transparent and are not reported on an individual drug level. Plaintiff's expert used a proxy of 23.1% for rebates, based off the Medicaid Drug Rebate Program. Plaintiff's expert calculated the collusive revenue post-rebate by taking the collusive revenues for each drug and subtracting 23.1%.

12. Clobetasol alone accounted for $735 million of the collusive revenues or approximately 23% of Taro's revenues since mid-2013. The market recognized the exorbitant profits Taro reaped from its price hikes. A September 21, 2016 analyst report on Taro's parent Sun Pharmaceuticals by Dr. Harith Ahamed and Krishna Kiran Konduri of Spark Capital noted how critical Clobetasol price increases had been for the Company's success:

> Price increases across its derma portfolio has been a key driver for Taro's strong performance in recent years. For instance, clobetasol propionate, Taro's top product, accounting for [approximately] 11% of sales in FY16, has witnessed price increases of >12x between 2013 and 2015.

*See also, e.g.*, December 18, 2016, Credit Suisse analyst Anubhav Aggarwal (estimating that Taro "has seen over a $1 billion boost to its profits" "from raising generic drug prices" and that "[m]ore than 80% of Taro's profits are contributed by price increase").

13. During the Class Period, Defendants misled investors about the competition Taro faced and about how Taro conducted its business. For example, Defendants repeatedly told investors that "Taro's sales and earnings growth [was] attributable to upward price adjustments and a prudent lifecycle management of [the Company's] product portfolio[;]" that "[t]here [was] a very strong market mechanism which we believe is fully in operation[;]" and that margins "largely depend[ed] on competitive intensity which is not in our hands" while Defendants knew or recklessly disregarded that Taro was fixing prices – eliminating competition between the Conspirators for the Drugs. Defendants also concealed the fact that they were threatening the Company with substantial liabilities from Taro's ongoing antitrust violations.

14. Taro's sales figures and other measures of Taro's financial performance were also misleading. Based on Defendants' false and misleading statements, investors reasonably assumed that Taro's sales figures relating to its generic drugs were an accurate representation of the success of Taro's products in a competitive market. But those sales figures were inflated as a

result of Taro's anti-competitive conduct, and did not reflect the sales Taro would have been able to achieve absent its price-fixing activity. Investors were entitled to know whether Taro's sales figures were inflated through its participation in an anticompetitive cartel and if these figures were susceptible to being deflated if and when the cartel were to break. Furthermore, Taro's inflation of sales through illegal price-fixing carried the significant risk of prosecution by state and federal antitrust authorities along with the attendant negative financial and reputational harm.

15. On September 9, 2016, Taro disclosed in its Form 6-K that "Taro Pharmaceuticals, U.S.A., Inc. . . . as well as two senior officers in its commercial team, received grand jury subpoenas from the United States Department of Justice [DOJ], Antitrust Division, seeking documents relating to corporate and employee records, generic pharmaceutical products and pricing, communications with competitors and others regarding the sale of generic pharmaceutical products, and certain other related matters."[3]

16. After this disclosure, Taro stock fell to a September 12, 2016 closing price of $119.42 from a September 9, 2016 closing price of $124.36, a decline of approximately 4%.

17. On November 3, 2016, *Bloomberg* confirmed the market's concerns when it reported that the first criminal charges in the government's generic pharmaceutical antitrust investigation were imminent. The article, which specifically mentioned Taro, revealed the seriousness of the government's case. The market devalued Taro as a result of this revelation and Taro stock fell to a November 3, 2016 closing price of $93.68 from a November 2, 2016 closing price of $101.05, a decline of over 7%.

---

[3] Taro's parent company, Sun Pharmaceuticals, Inc., was also subpoenaed by the DOJ in May 2016. The DOJ seeks information about the pricing and marketing of the generic drugs Sun sells in the United States. The DOJ also asked Sun's United States unit for documents related to employee and corporate records and communications with competitors.

18. Numerous governmental offices, both state and federal, are investigating and litigating against the generic industry for illegal price fixing. On December 14, 2016, twenty states (the "States") filed a civil case against six generic drug manufacturers. The States allege that their investigation, which began in July 2014 and "is still ongoing," "uncovered evidence of a broad, well-coordinated and long-running series of schemes to fix the prices and allocate markets for a number of generic pharmaceuticals in the United States." Significantly, the States have made clear that the evidence of wrongdoing they have uncovered extends far beyond the defendants and drugs identified in their "initial civil action." Indeed, the Attorney General of Connecticut, George C. Jepson, whose office led the States' antitrust investigation, told the New York Times: "We believe that this is just the tip of the iceberg. I stress that our investigation is continuing, and it goes way beyond the two drugs in this lawsuit, and it involves many more companies than are in this lawsuit."[4] *See also* January 6, 2017 Law360 article entitled "Generic Drug Price-Fixing Suits Just Tip Of The Iceberg" by Eric Kroh ("[n]ow that the DOJ investigation has yielded charges, a chain reaction has begun that will pull in many more individuals and companies, experts say").

19. Indeed, when intervening in another generic drug price fixing case in March 2017, the DOJ stated that "[a]lthough, to date, the United States has filed charges against [2 individuals]…the criminal investigation into the generic pharmaceuticals industry is ongoing and broad-ranging, and it has already implicated numerous corporations and individuals."

20. Private antitrust litigants, including countless pension funds, have recently sued Taro and other generic pharmaceutical companies. There are 85 private litigations alleging that

---

[4] Katie Thomas, *States Accuse Generic Drug Companies of Price Fixing*, N.Y. Times (Dec. 15, 2016), https://www.nytimes.com/2016/12/15/business/generic-drug-price-lawsuit-teva-mylan.html?_r=0.

generic pharmaceutical companies, including Taro, fixed prices with other generic drug companies relating to one or more of drugs, including five of the seven Drugs. Notably, Taro is a defendant in over half – 43 – of these cases.

21. Lead Plaintiff seeks remedies for the tens of millions of dollars it and the proposed Class suffered as a result of Defendants' violations of the federal securities laws.

**JURISDICTION AND VENUE**

22. The claims asserted herein arise under and pursuant Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

23. This Court has subject matter jurisdiction over this action pursuant to Section 22 of the Securities Act and 28 U.S.C. § 1331.

24. Venue is proper in this District pursuant to Section 27 of the Exchange Act, and pursuant to 28 U.S.C. § 1391(a), (b), and (c) because all Defendants transact business in this District.

**PARTIES**

25. Lead Plaintiff purchased Taro common stock during the Class Period and suffered damages as a result of Defendants' violations of the federal securities laws described herein.

26. Defendant Taro is an Israeli corporation, which operates in Israel and elsewhere through its Israeli, North American, and European subsidiaries, principally Taro U.S.A.

27. Defendant Kalyanasundaram Subramanian, known in industry circles as Kal Sundaram, was Taro's Chairman of the Board from April 2012 until he was appointed CEO in August 2013. Subramanian was Taro's CEO until December 2016 when he resigned from Taro, which resignation was announced in July 2016. Subramanian was also Sun Pharmaceutical's

("Sun") Chief Executive Officer from April 2010 to April 2012 and a director of the Sun board of directors until March 2012.

28. Defendant Michael Kalb served as Taro's Chief Financial Officer, Chief Accounting Officer, and Group Vice President from June 2009 until his resignation in July 2016.

29. Defendants Subramanian and Kalb are referred to as the "Individual Defendants."

**Relevant Non-Party Corporations**

30. Non-party Sun Pharmaceuticals Industries Ltd., Taro's majority shareholder, owns, or controls 69% of Taro's ordinary shares. Sun is an Indian multinational pharmaceutical company headquartered in Mumbai, Maharashtra that manufactures and sells pharmaceutical formulations and active pharmaceutical ingredients primarily in India and the United States.

31. Non-party Defendant Sandoz, Inc. ("Sandoz"), is a Colorado corporation with its principal place of business in Princeton, New Jersey. Sandoz is a global leader in generic pharmaceuticals and biosimilars, and is a subsidiary of Novartis AG. Sandoz acquired Fougera Pharmaceuticals in 2012. Sandoz sold Clobetasol, Clomipramine, Econozale, and Fluocinonide in the United States during the Class Period.

32. Non-party Akorn, Inc. ("Akorn") is a Louisiana corporation with its principal place of business in Chicago, Illinois. Akorn acquired Hi-Tech Pharmacal in August 2013, in part to broaden its product line into topical creams and ointments. As a result of its acquisition of Hi-Tech Pharmacal, Akorn, through Hi-Tech, sold Clobetasol products to customers in the United States during the Class Period.

33. In this Complaint, Hi-Tech Pharmacal and Akorn will be referred to collectively as "Hi-Tech."

34. Non-party Teva Pharmaceuticals USA, Inc. ("Teva") is a Delaware corporation

with its principal place of business in North Wales, Pennsylvania. Teva sold Enalapril and Fluocinonide in the United States during the Class Period. In August 2016, Teva acquired the "Actavis Generics" business from Allergan plc. Actavis Generics sold Clobetasol, Desonide, and Fluocinonide during the Class Period.

35. Non-party Mylan Pharmaceuticals, Inc. ("Mylan") is a Delaware corporation with its principal place of business in Canonsburg, Pennsylvania. Mylan sold Clomipramine and Enalapril in the United States during the Class Period.

36. Non-party Teligent, Inc. ("Teligent") is a Delaware corporation that has its principal place of business in Buena, New Jersey. Prior to October 2015, Teligent operated under the name IGI Laboratories, Inc. ("IGI Labs"). Teligent and IGI sold Econozale in the United States during the Class Period.

37. Throughout this complaint, Teligent and IGI Labs are referred to as "Teligent".

38. Non-party Perrigo New York, Inc. ("Perrigo") is a Delaware corporation with offices at 1700 Bathgate Avenue, Bronx, New York. Perrigo, sold Desonide and Econozale in the United States during the Class Period.

39. Non-party Wockhardt USA LLC ("Wockhardt") is a Delaware corporation with its principal place of business in Parsippany, New Jersey.

40. Non-party Morton Grove Pharmaceutical ("Morton") is headquartered in Chicago, Illinois. Morton Grove was acquired by Wockhardt Limited in October 2007.

41. Wockhardt sold Enalapril in the United States during the Class Period.

42. Non-party Lannett Company ("Lannett") is a Delaware corporation headquartered in Philadelphia, Pennsylvania. During the Class Period, Lannett sold Acetazolamide products in the United States.

43. Non-party Legacy Pharmaceuticals ("Legacy") is a pharmaceutical company headquartered in Switzerland. Legacy sold Enalapril in the United States during the Class Period.

44. Non-party G&W Laboratories ("G&W Labs") is a pharmaceutical company headquartered in New Jersey. G&W Labs sold Clobetasol external ointment during the Class Period.

45. Non-party Mayne Pharma Group ("Mayne") is a pharmaceutical company headquartered in Australia. Mayne sold Fluocinonide products during the Class Period.

46. Non-party Watson Pharmaceuticals, Inc. (Watson") is a pharmaceutical company headquartered in Parsippany, New Jersey. Watson sold Fluocinonide products during the Class Period.

47. Non-party Oceanside Pharmaceuticals ("Oceanside") is a pharmaceutical company headquartered in Aliso Viejo, California. Oceanside sold Enalapril products during the Class Period.

48. Non-party Northstar Rx ("Northstar") is a pharmaceutical company headquartered in Memphis, Tennessee. Northstar sold Enalapril products during the Class Period.

49. Whenever in this Complaint reference is made to any act, deed, or transaction of any corporation, the allegation means that the corporation engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

**Relevant Non-Party Individuals**

50. James Kedrowski became a member of the Taro Board in May 2011. In addition, Kedrowski served as the Company's Interim Chief Executive Officer from October 2010 until

August 2013. Kedrowski has also been with Chattem Chemicals, Inc., an indirect subsidiary of Sun since 1997 and is currently its Executive Vice President.

51. Michael Perfetto has served as Taro's Chief Commercial Officer since January 2013. Perfetto was Actavis' Vice President of Sales and Marketing from August 2003 to January 2013.

52. Ara Aprahamian has been Taro's Vice President of Sales and Marketing since March 2013. Aprahamian was Actavis' Director of Pricing & Contracting from August 2010 to March 2013.

53. Alex Likvornik was, for most of the Class Period (until July 2016), Taro's Director of Pricing and Contracts. Likvornik is currenty Sun's Director of Strategic Pricing and Marketing. Prior to serving as Taro's Director of Pricing and Contracts, Likvornik was Taro's Director of Business Intelligence from June 2011 to April 2013 and Taro's Senior Manager of Customer Finance from March 2009 to June 2011.

54. Sheila Curran is the Vice President of Sales Operations at Taro Pharmaceuticals.

55. Douglas Statler was Taro's Associate Vice President of National Accounts/Field Sales from January 2008 to December 2013.

56. Scott Brick has been Taro's Director and Senior Manager of Corporate Accounts from August 2011 to the present. Brick was Taro's Manager of National Accounts from May 2005 to July 2011.

57. Kevin Kriel was Taro's Executive Director of Business Development and Brand Marketing from July 2013 to September 2015.

## SUBSTANTIVE ALLEGATIONS

### A. Overview of the Generic Drug Market

58. As discussed on the Federal Drug Administration website, as well as in the various antitrust cases, brand name drugs are typically patented and the patent owner can charge a monopoly price. After the patent expires, generic drugs enter the market. Generic versions of brand name drugs are priced significantly below the brand versions. Because of the price differentials, and other institutional features of the pharmaceutical market, generic versions are liberally and substantially substituted for their brand counterparts. In every state, pharmacists are permitted (and, in some states, required) to substitute a generic product for a brand product unless the doctor has indicated that the prescription for the brand product must be dispensed as written.

59. Generic pharmaceutical drugs – drugs that are pharmaceutically equivalent in dosage, form, route of administration, strength or concentration and have the same active ingredients as the reference-listed brand name drug – save consumers and our healthcare system tens of billions of dollars annually because they introduce competition into a market where none previously existed.

60. When a high-priced branded drug comes off patent, generic drugs offer the prospect of lower prices and greater access to healthcare for all consumers in the United States. In a January 31, 2012 report, the Government Accounting Office noted that "[o]n average, the retail price of a generic drug is 75 percent lower than the retail price of a brand-name drug."[5]

61. Generic drugs have long been referred to as one of the few "bargains" in the United States healthcare system and historically health care experts have said that cost savings from the growing number of generic drugs have gone a long way toward keeping the lid on

---

[5] *See* http://www.gao.gov/assets/590/588064.pdf.

overall increasing health care costs. This was the way the generic drug market was intended to work, and has generally worked, since the implementation of the Hatch-Waxman Act in 1984.

62. The Hatch-Waxman Act was intended to balance two seemingly contradictory interests: encouraging drug innovation, and promoting competition between brand and generic drugs in order to lower drug prices. To encourage innovation, Hatch-Waxman gave branded drug manufacturers longer periods of market exclusivity for newly-approved products; this increased the financial returns for investment in drug research and development.

63. Prior to the conspiracy alleged herein, the FDA has recognized that "[g]eneric competition is associated with lower drug prices[.]" https://www.fda.gov/aboutfda/centersoffices/officeofmedicalproductsandtobacco/cder/ucm129385.htm. A Federal Trade Commission study reached the same conclusion, finding that in a "mature generic market, generic prices are, on average, 85% lower than the pre-entry branded drug prices." *See* Pay-for-Delay: How Drug Company Pay-Offs Cost Consumers Billions Federal Trade Commission (January 2010).

64. Economic literature in the healthcare market further confirms that competition by generic products results in lower prices for consumers. In the period before generic entry, a brand drug commands 100% of the market share for that drug and the brand manufacturer can set the price without the impact of competitive market forces. Once the first generic enters the market, however, a brand drug rapidly loses sales, on average 90% within a year. As more generic manufacturers enter the market, prices for generic versions of a drug predictably will continue to decrease because of competition among the generic manufacturers, and the loss of sales volume by the brand drug to the corresponding generic accelerates as more generic options are available to purchasers.

65. A mature generic market, such as the market for the Drugs, has several generic competitors. *See id*. Due to the fact that each generic is readily substitutable for another generic of the same brand drug, the products behave like commodities, with pricing being the main differentiating feature and the basis for competition among manufacturers. Over time, generics' pricing nears the generic manufacturers' marginal costs.

66. Over the last several years, however, the price dynamic for many generic drugs has changed for a large number of generic drugs. As detailed in *Connecticut v. Aurobindo Pharma USA, Inc.*, No. 3:16-cv-02056, Complaint (ECF. No. 1), ¶ 7 (D. Conn. Dec. 14, 2016) ("AG Complaint"), a joint complaint filed by the attorneys general of 20 states following a lengthy investigation into generic drug price increases, generic drug manufacturers operate, through their respective senior leadership and marketing and sales executives, in a manner that fosters and promotes routine and direct interaction among their competitors. The companies exploit their interactions at various and frequent industry trade shows, customer conferences and other similar events, to develop relationships and, sometimes, conspire to fix prices. *Id.* at ¶ 7. The anticompetitive agreements are further refined and coordinated at regular "'industry dinners," "girls nights out," lunches, parties, and numerous and frequent telephone calls, emails and text messages. *Id.* at ¶¶ 7, 55.

67. Price hikes in generic drugs have, at times, been staggered. This is a common occurrence in cartels, done with the specific purpose of avoiding detection. There has been extensive research on cartels and the timing of price hikes in the Official Journal of the European Union and the Directorate-General Competition of the European Commission. In many cartels, there is orchestration of who would move first and when the others would follow which could be days, weeks, months, or later.

**B. How Generic Pharmaceuticals Are Priced**

68. As discussed in the antitrust complaints, the pricing of prescription pharmaceutical products in the U.S. is governed by different institutional features than those present in the marketplace for other consumer products.

69. Ordinarily, the price for a consumer product is set by the retailer based on the amount the typical consumer is willing to pay. Because of the unique features of the prescription drug marketplace, however, pricing of prescription drugs for most consumers is not determined between the retailer and the consumer. Rather, because most consumers' prescription drug purchases are reimbursed by public or private health plans, the pricing for prescription drugs is determined by reimbursement agreements between these prescription drug payors, i.e., health plans and their prescription benefit managers, and the pharmacies that dispense drugs to the payors' insured consumers.

70. At one time, payors relied on cost-based pricing metrics to reimburse pharmacies that dispensed drugs to their insured consumers, paying the dispensing pharmacies an amount based on the manufacturer's list price for the drug, plus a small mark-up and/or dispensing fee. Over time, however, it was learned that the list price for most generic drugs published by their manufacturers was substantially higher than the actual cost incurred by pharmacies to acquire the drugs.

71. To reduce the cost of prescription drugs to the public, prescription drug payors developed Maximum Allowable Cost prices ("MACs") to determine the amount that pharmacies would be reimbursed for dispensing generic pharmaceuticals. The MAC price refers to the maximum amount that a payor will reimburse a pharmacy for a given strength and dosage of a generic drug or brand name drug that has a generic version available. A MAC price thus represents the upper limit that a prescription drug payor will pay a pharmacy for a generic drug.

72. Payors set the MAC price of a drug based on a variety of factors, including, most significantly, the lowest acquisition cost for each generic drug paid by retail pharmacies purchasing from a wholesaler for each of a drug's generic versions.

73. Of particular note, MAC pricing is designed to incentivize pharmacies to purchase the least costly version of a generic drug available in the market, without regard to the manufacturer's list price. Because the reimbursement amount to a pharmacy is limited by the MAC price for a generic drug and each of its equivalents regardless of the pharmacy's acquisition cost, a pharmacy's profit will be reduced, or lost altogether, if it purchases other than the lowest cost generic product. Alternatively, if a retail pharmacy purchases the lowest priced generic version of the drug, it will maximize its profit.

74. MAC pricing also incentivizes an individual generic manufacturer to refrain from unilaterally increasing its prices. Because MAC pricing bases reimbursement on the generic drug's lowest acquisition cost, a generic manufacturer that increases its price for a drug while competing manufacturers do not will swiftly lose sales to a competing generic manufacturer whose price remains constant.

75. Consequently, in the absence of coordinated pricing activity among generic manufacturers, an individual generic manufacturer cannot significantly increase its price without incurring the loss of a significant volume of sales.

76. As discussed below in Section C at ¶204 *et seq.*, the pricing of the Drugs was completely at odds with the normal dynamics of the generic drug industry.

### 1. Taro Conspired to Fix Prices on at Least Seven Drugs With Other Generic Pharmaceutical Companies at Numerous Trade Association Meetings

77. Plaintiff consulted with an economic expert with expertise in evaluating markets for collusive behavior. Plaintiff's expert, Fideres Partners LLP ("Fideres"), specializes in

developing economic evidence where evidence of market collusion or other forms of wrongdoing need to be articulated at a high level of detail. Fideres has experience and expertise in identifying market manipulation and collusion, as well as unique models to analyze opaque market structures. Fideres has a long track record in investigating complex anti-trust cases and has extensive experience in identifying collusion markers and analyzing the so-called 'plus factors' discussed below.

**a. Clobetasol**

78. Clobetasol, which has been available on the market since 1994, is a high-potency prescription corticosteroid used in the treatment of various skin disorders including eczema, psoriasis, dermatitis, and vitiligo. It is reportedly one of the most prescribed dermatological drugs in the United States.

79. Beginning in May 2014, contrary to past practice, the Clobetasol Conspirators, acting in unison, caused the price of Clobetasol to dramatically increase. These dramatic increases were not the result of material changes in costs, supply, or demand. These price increases were instead the result of an agreement among the Clobetasol Conspirators to increase pricing and restrain competition, and allocate customers for the sale of Clobetasol in the United States.

80. The agreement to fix Clobetasol prices was decided principally at the GPhA's February 2014 Annual Meeting, the 2014 annual meeting of the NACDS held on April 26-29, 2014 in Scottsdale, Arizona and the 2014 GPhA Workshop on June 3-4, 2014 in Bethesda, Maryland.

81. The Clobetasol Conspirators also had further discussions at the NACDS' Total Store Expo meeting from August 23-26, 2014 at the Boston Convention Center in Boston, MA.

82. Aprahamian and Perfetto – who, as related by CWs 1 and 2, had the authority to change pricing and instructed CW2's team to change pricing (*see* ¶¶196-202) – attended the April 2014 NACDS meeting, as well as the August 2014 meeting. Taro parent Sun's Steven Goodman and Steven Smith, Sr., Director of Generics Marketing and Director of Sales, respectively, also attended the April 2014 meeting.

83. Other Taro attendees at the August 2014 meeting included: Scott Brick, Manager, National Accounts; Kevin Kriel, Executive Director, Marketing & Business Development, U.S. and Canada; Alex Likvornik, Sr. Director, Strategic Pricing and Marketing; and Christopher Urbanksi.

84. Other Clobetasol Conspirator attendees at the August 2014 meeting included:

a. Hi-Tech: Ed Berrios, VP, Sales and Marketing; Michael Corley, VP, National Accounts; Thomas Kronovich, VP, National Accounts; Bruce Kutinsky, Chief Operating Officer; Mick McCanna, Executive Director of National Accounts; Raj Rai Chief, Executive Officer; John Sabat, Senior Vice President of National Accounts; M. Tranter, National Accounts Manager, Sales & Marketing; and

b. Sandoz: Lisa Badura, Director, Key Customers; Christopher Bihari, Director, Key Customers; Steven Greenstein, Director, Key Customers; Anuj Hasija, Executive Director Key Customers; rmondo Kellum, Vice President, Sales and Marketing; Della Lubke, National Account Executive; Scott Smith, VP Sales & Marketing; Arunesh Verma, Executive Director Marketing; Sean Walsh, Director, Key Customers.

85. Representatives from Clobetasol Conspirators also attended the GPhA meetings in February and June 2014, as well as a meeting in August 2014, respectively. *See* Exhibit A (chart of pharmaceutical trade meetings).

86. All the Clobetasol Conspirators – Taro, Sandoz, Perrigo, Hi-Tech, Actavis, Morton Grove, G&W Labs, and Perrigo – attended the February 2014 meeting.

87. Shortly after the April 26-29, 2014 meeting with Clobetasol Conspirators Sandoz, Perrigo, and Actavis, and continuing after the June 3-4, 2014 meeting, at which Clobetasol Conspirators Taro, Sandoz, Hi-Tech, Perrigo and Actavis were present, Taro raised its Clobetasol external cream, external ointment, topical solution, and topical gel prices in May and June 2014 by 1,886%, 2,081%, 530% (just in June), and 1,628%, respectively.

88. Hi-Tech raised its Clobetasol external cream, external ointment, topical solution, and topical gel prices in July and August 2014 by 1,268%, 2,244%, 617%, and 1,909%, respectively.

89. Sandoz raised its Clobetasol external cream, external ointment, topical solution, and topical gel prices in July and August 2014 by 1,116%, 1,246%, 416%, and 877%.

90. Morton raised its Clobetasol topical solution prices by 953% in August and September 2014.

91. Actavis entered the Clobetasol external cream and topical solution markets in June and August 2015, respectively, at the fixed price – rather than undercut the fixed price as a rational economic actor.

92. G&W Labs entered the Clobetasol external ointment market in October 2016 at the fixed price – rather than undercut the fixed price as a rational economic actor.

93. Perrigo raised its Clobetasol topical gel price in January 2016 by 981%.

94. The following chart demonstrates the coordinated increase of Clobetasol external cream prices, based on the wholesale acquisition cost (WAC), which is a manufacturer's reported list price to sell a drug to a direct purchaser wholesaler:




95. As the next three charts illustrate, the Clobetasol Conspirators' price increases for Clobetasol external ointment, topical gel, and topical solution were steep and coordinated:

# Clobetasol (External Ointment)

## WAC Price




*Source: Symphony Health Solutions, Fiderès Calculations*

# Clobetasol (Topical Gel)

## WAC Price




*Source: Symphony Health Solutions, Fideres Calculations*

## Clobetasol (Topical Solution)

WAC Price




*Source: Symphony Health Solutions, Fideros Calculations*

Taro Charts 10

96. The Clobetasol Conspirators' anomalous price increases are unmistakable. Clobetasol prices remained at supra-competitive levels throughout the Class Period.

97. The Clobetasol Conspirators' price increases were against their economic self-interest. Clobetasol is a commodity product. Therefore, absent a cartel, if any manufacturer increased the price of Clobetasol, it would be expected that its competitors would not increase the price, but would seek to sell more Clobetasol to the first manufacturer's customers. Accordingly, it would not be in any manufacturer's unilateral self-interest to increase the price of the Clobetasol it sold unless it had an agreement with the other manufacturers that they would do the same.

98. In 2014, there was no significant increase in the costs of making Clobetasol, there was no significant decrease in supply, and there was no significant increase in demand.

Nonetheless, there were extraordinary increases by each of the Cloebtasol Conspirators' prices they charged their customers for Clobetasol. Such price increases in a commodity product for which there were no significant increases in costs or demand, or significant decrease in supply, would not have been in each Clobetasol Conspirators' unilateral self-interest absent the existence of a cartel.

99. In addition, Taro paid over $50 million to break its price lock contracts with pharmacies in the summer of 2014, right before it implemented its largest price hikes on Clobetasol. In an open market, if Taro had not previously coordinated pricing with its competitors, its prices would have been undercut and the break costs would be lost. Taro would not have risked the break costs if there was no collusion.

100. Clobetasol Conspirators' dramatic and unexplained price increases have resulted in extensive scrutiny by the United States Congress and federal and state regulators.

101. Federal law requires drug manufacturers to report potential drug shortages to the FDA, the reasons therefor, and the expected duration of the shortage. No supply disruption was reported by Clobetasol Conspirators with respect to Clobetasol during the Class Period.

**Taro's Profits Skyrocketed After Fixing Clobetasol Prices**

102. The Clobetasol Conspirators' adherence to their price-fixing scheme generated considerable profits.

103. Taro's collusive Clobetasol revenues (actual revenues earned from collusive behavior minus 'but for' revenues (revenues that would have been earned in a non-collusive market) from mid-2014 through 2016 totaled $956 million. Backing out a conservative rebate[6]

[6] Taro's 20-F filed June 9, 2016 states: "When the Company recognizes and records revenue from the sale of its pharmaceutical products, the Company, in the same financial reporting period, records an estimate of various future deductions related to the sale. This has the effect of reducing the amount of reported product sales. These deductions include the Company's

estimate from this figure leaves $735 million. Thus, Clobetasol collusive revenues alone account for at least 23% of Taro's revenues from mid-2013 through 2016. A 23.1% rebate estimate was used to calculate this figure.

104. Indeed, before the price increase in June, Taro's Clobetasol averaged $1.8 million in monthly gross sales. After the price increase, Taro's *monthly* gross sales of Clobetasol increased to $40 million, while its market share remained relatively stable during this period.

105. In its Q2 2015 earnings call with industry analysts on November 10, 2014, Defendant Kalb stated: "Net sales for Q2 were $251 million, up 22% over Q2 last year. As we anticipated in last quarter's earnings release we are realizing the benefits of the previous quarter's price adjustments in the current quarter. Gross profit increased 24% to $198 million year – on – year resulting in a 130 basis points expansion in our gross margins to 79%."

106. On September 13, 2016, the Economics Times of India reported that "While Taro has been gaining approvals for its products, a significant portion of its revenue growth has come from price increases."[7]

107. Other Clobetasol Conspirators also reaped large profits after the price hikes. In its annual report for the period ended December 31, 2015, Akorn reported: "Our gross profit increased by $334.7 million, an increase of 128.0% over gross profit of $261.4 million in 2014.

---

estimates, which may require significant judgement of chargebacks, product returns, rebates, cash discounts and other sales deductions." Thus, Taro's reported net sales figures have backed out rebates they will pay to customers. Thus, when performing its calculations, Plaintiff's expert accounted for such rebates in its calculations for collusive revenues.

[7] Divya Rajagopal, *Taro Pharmaceutical Industries under anti-trust scanner for price hike,* Economic Times (Sept. 13, 2016), http://economictimes.indiatimes.com/industry /healthcare/biotech/pharmaceuticals/taro-pharmaceutical-industries-under-anti-trust-scanner-for-price-hike/printarticle/54302910.cms.

Our overall gross profit margin was 60.5% in 2015 compared to 47.1% in 2014." The company attributed the increased profit margin to the effects of "price changes."

108. In or about May 2016, Hi-Tech told industry analysts that "63% of [its] growth in 1Q16 versus 1Q15 was driven by price."

109. In its Q2 2016 earnings call with industry analysts on August 4, 2016, Akorn's CFO, Duane Portwood, stated: "net revenue for the quarter ended June 30, 2016, was $281 million, an increase of $60 million or 27% over the prior-year quarter. The increase in revenue was driven by organic growth, with approximately two-thirds attributable to price."

110. Similarly, Perrigo reported that gross profit grew by $59 million from 2014 to 2015, primarily due in part to "pricing initiatives" taken in the first quarter of fiscal year 2015 (July-September 2014).

**b. Desonide**

111. Desonide is a topical corticosteroid used for the treatment of a variety of skin conditions, including eczema, dermatitis, and psoriasis. For years, competition among the small group of sellers of Desonide kept prices stable, at relatively low levels. But beginning in April 2013, after representatives of each Desonide Conspirator attended meetings of the Generic Pharmaceutical Annual Meeting from February 20-22, 2013 and the NACDS Annual Meeting from April 20-23, 2013, the Desonide Conspirators abruptly raised their respective generic Desonide list prices.

112. In April and May, 2013, Taro raised its Desonide prices for external cream and external ointment by 590% and 419%, respectively.

113. From April through June 2013, Perrigo raised its Desonide prices for external cream and external ointment by 654% and 661%.

114. Sandoz's Desonide external ointment prices rose 729% in January and February 2014 – shortly after the October 28-30, 2013 GPhA meeting.

115. G&W Labs entered the Desonide external cream market in September 2015 at the fixed price.

116. While the Desonide Conspirators raised their Desonide prices to nearly identical supracompetitive levels, Desonide formulations that were not controlled by the Desonide Conspirators (and are not at issue in this action) did not experience similar coordinated price increases. The Desonide Conspirators' price increases were not the product of unilateral business decisions, but resulted instead from a conspiracy.

117. At the April 2013 NACDS meeting, the following representatives attended:

a. (Taro): Ara Aprahamian, Jim Kedrowski, and Michael Perfetto;

b. (Perrigo): Joseph Papa, Chairman and CEO; Doug Boothe, President of Generics Division; John Wesolowski, Acting General Manager; Jim Tomshack, Sr. VP of Sales; and Philip Willis, Innovation and Marketing Strategy;

c. (Actavis) Paul Bisaro, Board Member; Andrew Boyer, President and CEO; North America Generics; Sigurdur Olafsson, President and CEO, Global, Generics Medicines; Robert Stewart, Chief Operating Officer; Michael Baker, EVP of Trade Sales and Development; Paul Reed, Sr. Director of Trade Sales and Development

118. At the GPhA CMC Workshop June 4-5, 2013 meeting, Taro and Perrigo representatives attended.

119. The following chart show the per-unit prices for the Desonide Conspirators' Desonide products between January 2009 and December 2016 based on the WAC:

# Desonide (External Cream)

## WAC Price




*Source: Symphony Health Solutions, Fideros Calculations*

Taro Charts 12

120. Indeed, Taro's price hikes for Desonide are highly correlated:




121. The Desonide Conspirators' Desonide pricing practices significantly increased revenues for themselves and their corporate parents.

122. Taro's collusive Desonide revenues from mid-2013 through 2016 totaled $203 million. Backing out a conservative rebate estimate from this figure leaves $156 million.

123. Taro's parent company's 20-F filing for the year ended March 2014 (which included the June 2013 price increases), reported that gross profits increased by $85 million as compared to the prior year. The increase was "primarily the result of price adjustments on select products." SEC filings by Taro's parent company have consistently listed Desonide among its "key products".

124. Perrigo's parent company reported in its November 2013 10-Q that in the three months ended September 28, 2013 (which included its Desonide price increases) its net

pharmaceutical sales were $41 million higher than for the same period in 2012. Perrigo attributed the increase to "improved pricing on select products as compared to the prior year," among other things."

**There Are No Apparent Lawful Explanations for the Desonide Conspirators' Price Increases**

125. As with Clobetasol, there are numerous features of the Desonide market relevant showing that its markets are susceptible to collusion and that the price increases and customer allocations were the result of collusion and not the result of conscious parallelism.

126. As shown above, competition in the Desonide markets had caused prices to stabilize and remain relatively low since at least mid-2011 until Desonide Conspirators' price increases in June 2013.

127. Between September 2011 and June 2013, no significant sellers left or entered the markets and there was no significant shift in Desonide Conspirators' relative market shares. There were thus no significant changes in the composition of the Desonide markets that would have provided any Desonide Conspirator with a reason to depart from years of stable pricing.

128. Nor have the Desonide Conspirators faced significantly increased costs for the active pharmaceutical ingredient – Desonide – that would have necessitated higher prices.

129. The Desonide Conspirators' price increases also cannot be attributed to a supply disruption. The FDA encourages drug manufacturers to report potential supply interruptions to the FDA, the reasons for the interruption, and the expected duration of the shortage. Desonide Conspirators have not reported any supply disruptions with respect to Desonide. There were also no significant decreases in Desonide Conspirators' overall sales volume that might indicate a shortage in the availability of Desonide's active ingredient.

130. Finally, because generic pharmaceutical manufacturers do not incur the large research and development costs that brand manufacturers absorb in developing new drugs – and costs associated with obtaining FDA approval were incurred over 20 years ago – the price increases cannot be attributed to the need to fund research and development related to Desonide.

**c. Fluocinonide**

131. Fluocinonide is a topical corticosteroid used for the treatment of a variety of skin conditions, including eczema, dermatitis, and psoriasis.

132. Beginning in June 2014, contrary to past practice, the Fluocinonide Conspirators, acting in unison, caused the price of Fluocinonide to dramatically increase. These dramatic increases were not the result of material changes in costs, supply, or demand. These price increases were instead the result of an agreement among Fluocinonide Conspirators to increase pricing and restrain competition, and allocate customers for the sale of Fluocinonide in the United States.

133. For many years, competition among the small group of sellers of Fluocinonide kept prices stable, at relatively low levels. But in June 2014, after representatives of Fluocinonide Conspirators Taro (Aprahamian and Perfetto) and Sandoz attended the April 2014 NACDS meeting, and representatives of Fluocinonide Conspirators (Taro, Teva, and Sandoz) attended a June 2014 GPhA meeting, Taro raised the prices of its external cream, external ointment, and topical gel variants by 404%, 376%, and 181% (in May and June).

134. In June and July 2014, Teva raised the prices of its external cream, external ointment, and topical gel variants by 434%, 415%, and 423%.

135. County Line Pharmaceuticals entered the Fluocinonide topical solution and external ointments market in May 2014 and October 2016, respectively, at or near the fixed price.

136. In October and November, 2014, Sandoz raised its Fluocinonide topical gel prices by 423%.

137. In November to December 2014, Watson raised its Fluocinonide external cream gel prices by 430%.

138. In February 2016, G&W Labs entered the Fluocinonide topical gel market at or near the fixed price.

139. In December 2016, Mayne entered the Fluocinonide external cream market near the colluded price.

140. The Fluocinonide Conspirators' price increases were not the product of unilateral business decisions, but resulted instead from a conspiracy to fix prices.

141. The following charts show the per-unit prices[8] for Fluocinonide Conspirators' Fluocinonide products between January 2009 and December 2016 based on the wholesale acquisition cost (WAC):

[8] Fluocinonide, like most pharmaceutical products, is sold in various increments and packages, *e.g.* 15mg or 30mg tubes of cream. Unless stated otherwise, prices in this complaint refer to per-unit prices for all increments.

# Fluocinonide (External Ointment)

## WAC Price




*Source: Symphony Health Solutions, Fideros Calculations*

# Fluocinonide (External Cream)

## WAC Price




*Source: Symphony Health Solutions, Fideres Calculations*

Taro Charts 16




142. Taro's collusive Fluocinonide revenues from mid-2013 through 2016 totaled $276 million. Backing out a conservative rebate estimate from this figure leaves $212 million. Thus, Fluocinonide collusive revenues alone account for approximately 7% of Taro's revenues from mid-2013 through 2016.

143. The Fluocinonide Conspirators' Fluocinonide pricing practices significantly increased revenues for themselves and their corporate parents. In a Form 20-F filed June 9, 2016, the Company reported that its gross profits increased over $100 million between its fiscal years ending in March 2015 and March 2016 — "primarily the result of the full year impact of prior year price adjustments on select products." Taro's SEC filings have consistently listed Fluocinonide among its "key products." Teva's parent company reported in its 2016 20-F that revenues from generic medicines sold in the United States increased by $246 million from 2013

to 2014 (when the price increases began) and by $375 million from 2014 to 2015 (the first full year of sales at the elevated price).

**There Are No Apparent Lawful Explanations for Fluocinonide Conspirators' Price Increases**

144. There are numerous features of the Fluocinonide market showing that it is susceptible to collusion and that the price increases and customer allocations were the result of collusion and not the result of conscious parallelism. There are no apparent lawful explanations for why the Fluocinonide Conspirators raised their prices in an unmistakable pattern to the same supracompetitive levels.

145. As shown above, prior to these conspirators' price increases, competition in the Fluocinonide markets had caused prices to stabilize and remain relatively low since at least January 2013.

146. Nor have Fluocinonide Conspirators faced significantly increased costs for the active pharmaceutical ingredient, Fluocinonide, that would have necessitated higher prices. The solution formulation of Fluocinonide did not experience a dramatic price increase in or around June 2014 like the ones the cream, emulsified base cream, ointment, and gel formulations experienced, even though the five formulations have the same active ingredient.

147. The Fluocinonide Conspirators' price increases also cannot be attributed to a supply disruption. The FDA encourages drug manufacturers to report potential supply interruptions to the FDA, the reasons for the interruption, and the expected duration of the shortage. The Fluocinonide Conspirators have not reported any supply disruptions with respect to Fluocinonide. There were also no significant decreases in these conspirators' overall sales volume that might indicate a shortage in the availability of Fluocinonide's active ingredient.

148. Finally, because generic pharmaceutical manufacturers do not incur the large research and development costs that brand manufacturers absorb in developing new drugs — and costs associated with obtaining FDA approval were incurred over 15 years ago — the price increases cannot be attributed to the need to fund research and development related to Fluocinonide.

**d. Econozale**

149. Econazole[9] – a potent topical antifungal used for the treatment of a variety of severe inflammatory skin infections (including, e.g., tinea, pityriasis versicolor, tinea pedis, dermatophysis and eczema marginatum) and one of the most prescribed antifungal dermatological drugs in the United States – experienced a dramatic price increase twice in 2014.

150. Beginning in July 2014, contrary to past practice, the Econozale Conspirators, acting in unison, began to cause the price of Econozale to dramatically increase. Beginning in late July 2014, immediately after Taro and Perrigo attended the April 2014 NACDS and June 2014 GPhA meetings, Econozale Conspirators Taro, Perrigo, and IGI Labs began to dramatically inflate their generic Econazole prices.

151. Aprahamian and Perfetto attended the April 2014 NACDS meeting, as did Econozale Conspirator Perrigo and Sandoz representatives.

152. Taro, Sun, Perrigo, and Sandoz representatives attended the June 2014 meeting.

153. Aprahamian and Perfetto also attended the August 2014 meeting.

154. Other Taro attendees at the August 2014 meeting included: Scott Brick, Manager, National Accounts; Kevin Kriel, Executive Director, Marketing & Business Development, U.S.

[9] As used herein, "econazole nitrate" refers to the drug generally, regardless of form. "Econazole" (with an upper case "E") refers specifically to the drug's topical cream form.

and Canada; Alex Likvornik, Sr. Director, Strategic Pricing and Marketing; and Christopher Urbanksi.

155. Other Econozale Conspirator attendees at the August 2014 meeting included:

a. Sandoz: Lisa Badura, Director, Key Customers; Christopher Bihari, Director, Key Customers; Steven Greenstein, Director, Key Customers; Anuj Hasija, Executive Director Key Customers; rmondo Kellum, Vice President, Sales and Marketing; Della Lubke, National Account Executive; Scott Smith, VP Sales & Marketing; Arunesh Verma, Executive Director Marketing; Sean Walsh, Director, Key Customers; and

b. Perrigo: Doug Boothe, President Generics Division; H. James, Booydegraaff Associate Director, Marketing; Ori Gutwerg, National Account Executive; Katie McCormack, National Account Manager; Richard McWilliams, Senior Vice President & General Manager; Kristine Norman, Account Executive; Tony Polman, National Account Executive; John Wesolowski, Acting General Manager.

156. In July and August 2014, Perrigo raised its Econozale prices approximately 723%.

157. In August 2014, IGI Labs raised its Econozale prices by approximately 691%.

158. Taro raised its Econozale prices in November and December 2014 by approximately 849%.

159. Sandoz entered the Econozale market in January 2016 at or near the colluded price.

160. The Econozale Conspirators increased their Econazole prices in lockstep, with Econozale Conspirators all raising their respective Econazole WAC prices to virtually identical

levels within roughly four months:




161. Taro's Econozale prices were highly correlated with its competitors:

## Collusive Marker: Price Hikes in Lock-Step

Manufacturer prices strongly positively correlated under collusion

- Price increases by manufacturers are highly correlated from 2014-2016




| Correlations | Perrigo Co | Taro Pharm Usa | Igi Labs Inc |
|---|---|---|---|
| Perrigo Co | 100.00% | | |
| Taro Pharm Usa | 77.03% | 100.00% | |
| Igi Labs Inc | 97.52% | 78.03% | 100.00% |

Correlation measured from 2014 to 2016

*Source: Symphony Health Solutions, Fideres Calculations*

Taro Price Fixing 80

**Taro Reaped Almost $100 Million By Colluding on Econozale**

162. Taro's collusive Econozale revenues (actual revenues earned from collusive behavior minus 'but for' revenues (revenues that would have been earned in a non-collusive market) from mid-2014 through 2016 totaled $118 million. Backing out a conservative rebate estimate from this figure leaves $91 million.

**No Commercial Justification for Price Hike**

163. There were no reasonable justifications for this abrupt shift in pricing conduct. One reason prices might rise could be a supply disruption or shortage, but there was no such disruption or shortage related to Econazole prior to, after or during mid-2013. The FDA reported no Econazole drug shortages, there was no new patent or formulation, no labelling changes and, once in production, Econazole is not difficult to make. Econozale Conspirators have not provided any meaningful explanation for the coordinated price rise.

**e. Clomipramine**

164. Generic clomipramine hydrochloride in its 25 mg, 50 mg and 75 mg oral capsule form is a tricyclic antidepressant used for the treatment of obsessive compulsive disorder, panic disorder, major depressive disorder and chronic pain, and included on the World Health Organization's List of Essential Medicines as one of the most important medications needed in a basic health system – experienced a dramatic price increase in mid-2013.

165. Notably, Clomipramine was specifically mentioned in the GAO report. *See* www.gao.gov/assets/680/679022.pdf ("clomipramine HCL/50mg/capsule/oral, an antidepressant used to treat symptoms of obsessive-compulsive disorder, increased over 2,000 percent in 1 year, going from $0.34 per capsule in the first quarter of 2013 to $8.43 per capsule in the first quarter of 2014").

166. In April 2013, shortly after a February 2013 GPhA meeting, the Clomipramine Conspirators began to dramatically and collectively increase the prices of their Clomipramine products pursuant to an anticompetitive agreement to restrain competition. The price increases closely followed the April 2013 NACDS meeting.

167. In April and May, 2013, Taro raised its Clomipramine prices by 2,651%.

168. In May and June, 2013, Mylan raised its Clomipramine prices by 2,168%.

169. In July and August, 2013, Sandoz raised its Clomipramine prices by 2,344%.

170. The Clomipramine Conspirators' discussions were furthered at an April 2013 NACDS meeting, at which Taro representatives Aprahamian and Kedrowski attended, as well as a June 4-5, 2013 GPhA CMC Workshop meeting, which was attended by Taro and Sandoz representatives.

171. Moreover, Clomiprimine Conspirators' Clomipramine coordinated their unprecedented price hikes during a short, roughly three-month period, as the inflation of their Clomipramine WAC prices illustrates:

## Clomipramine (Capsule)

WAC Price




*Source: Symphony Health Solutions, Fideres Calculations*

Taro Charts 11

172. Taro dominated the Clomipramine market. In 2013, Mylan's Clomipramine sales exceeded $96.14 million. Taro's Clomipramine sales for the same period exceeded $96.67 million, and Sandoz's 2013 Clomipramine sales exceeded $7.66 million. Based on these same sales figures, the Clomipramine Conspirators' sales make up roughly 97.9% of the clomipramine hydrochloride sales in the United States.

**Taro Reaps Over $200 Million From Clomipramine Price Fixing**

173. Taro's collusive Clomipramine revenues (actual revenues earned from collusive behavior minus 'but for' revenues (revenues that would have been earned in a non-collusive market) from early 2013 through 2016 totaled $262 million. Backing out a conservative rebate estimate from this figure leaves $202 million.

**No Commercial Justification for Price Hike**

174. There were no reasonable justifications for this abrupt shift in pricing conduct. One reason prices might rise could be a supply disruption or shortage, but there was no such disruption or shortage related to Clomipramine prior to, after or during mid-2013. The FDA reported no Clomipramine drug shortages, there was no new patent or formulation, no labelling changes and, once in production, clomipramine hydrochloride is not difficult to make. Clomiprimine Conspirators have not provided any meaningful explanation for the coordinated price rise.

**f. Enalapril**

175. Enalapril is used to treat high blood pressure, and is included on the World Health Organization's List of Essential Medicines as one of the most important medications needed in a basic health system – experienced a dramatic price increase in late-2013.

176. Beginning in April 2014, contrary to past practice, the Enalapril Conspirators, began to caused their Enalapril prices to dramatically increase. These dramatic increases were not the result of material changes in costs, supply, or demand. These price increases were instead the result of an agreement among Enalapril Conspirators to increase pricing and restrain competition, and allocate customers for the sale of Enalapril in the United States.

177. Representatives from Enalapril Conspirators Taro and Teva attended GPhA's Annual Meeting February 19-21, 2014.

178. In April 2014, Taro's Aprahamian and Perfetto, Sun's Steven Goodman and Steven Smith, as well as Enalapril Conspirator Wockhardt representatives, attended the Annual NACDS Meeting.

179. From June 3-4, 2014, Taro and Teva representatives attended the 2014 GPhA CMC Workshop in Bethesda, Maryland.

180. At the NACDS' Total Store Expo meeting from August 23-26, 2014 at the Boston Convention Center in Boston, MA, attendees included:

a. Taro: Aprahamian and Perfetto; Scott Brick, Manager, National Accounts; Kevin Kriel, Executive Director, Marketing & Business Development, U.S. and Canada; Alex Likvornik, Sr. Director, Strategic Pricing and Marketing; and Christopher Urbanksi;

b. Wockhardt: Karen Andrus, Director of Sales; Michael Craney, President of Sales & Marketing; Sunil Khera, President-The Americas, Japan & Emerging Markets; Scott Koenig, Vice President Sales and Marketing, Generics; Joe Niemi, Manager, National Accounts; Bob Watson, Vice President, National Accounts; and

c. Teva: Maureen Cavanaugh, Sr. VP and Chief Operating Officer of North America Generics; Kevin Galownia, Head of Marketing Operations; Christine Baeder, Sr. VP of Customer and Marketing Operations; Teri Coward, Sr. Director of Sales and Trade Relations.

181. In the 2014 GPhA Fall Technical Conference, held from October 27 to 29, 2014 in Bethesda, Maryland, Enalapril Conspirators Taro (and Sun), Teva, and Mylan representatives attended.

182. In April to May, 2014, Mylan increased its Enalapril prices approximately 230%.

183. In August to September, 2014, Teva increased its Enalapril prices by approximately 230%.

184. In October to November 2014, Taro increased its Enalapril prices approximately 244%.

185. In November to December, 2014, Wockhardt increased its Enalapril prices by 231%.

186. In January to February 2015, Legacy increased its Enalapril prices by 287%.

187. In July 2015, Northstar Rx entered the Enalapril market and increased its prices 30% in September 2015.

188. In September 2015, Oceanside entered the Enalapril market at or near the fixed price.

189. The Econozale Conspirators' price hikes were coordinated and unmistakable:




**Taro Reaps Almost $100 Million from Fixing Prices on Enalapril**

190. Taro's collusive Enalapril revenues from late-2014 through 2016 totaled $123 million. Backing out a conservative rebate estimate from this figure leaves $95 million.

**No Commercial Justification for Price Hike**

191. There were no reasonable justifications for this abrupt shift in pricing conduct. One reason prices might rise could be a supply disruption or shortage, but there was no such disruption or shortage related to Enalapril prior to, after or during late 2014. The FDA reported no Enalapril drug shortages.

**g. Acetazolamide**

192. Acetazolamide is used to treat glaucoma and some seizure disorders pressure, and is included on the World Health Organization's List of Essential Medicines. Beginning in November 2013, contrary to past practice, the Acetazolamide Conspirators, acting in unison, caused the price of Acetazolamide to dramatically increase. These dramatic increases were not the result of material changes in costs, supply, or demand. These price increases were instead the result of an agreement among Acetazolamide Conspirators to increase pricing and restrain competition, and allocate customers for the sale of Acetazolamide in the United States.

193. Representatives from Taro and Lannett met at the 2013 GPhA Fall Technical Conference from October 28 to 30, 2013 in Bethesda, Maryland.

194. Shortly after this meeting, the Acetazolamide Conspirators increased their Acetazolamide prices. Indeed, Lannett increased its Acetazolamide prices by 275% in November and December 2013, and Taro increased its Acetazolamide prices by 226% in December 2013 and January 2014 based on the wholesale acquisition cost (WAC), which is a manufacturer’s reported list price to sell a drug to a direct purchaser wholesaler:




195. Taro's collusive Acetazolamide revenues from late 2013 through 2016 totaled $63 million. Backing out a conservative rebate estimate from this figure leaves $49 million.

**2. Attendees From Taro at Trade Association Meetings Had the Authority to Raise Prices on Taro's Generic Drugs**

196. CW 1 was Taro's Director of Corporate Accounts for Prescription Sales from November 2007 until March 2014. In that capacity, CW1's responsibilities included stimulating business, working with customers, which included both large and small customers such as Amerisource Bergen, distributors, wholesalers, and chain drug stores. CW 1 worked for Michael Perfetto, Taro's President and Chief Commercial Officer, from the beginning of 2013 until January 2014 and for Douglas Statler, former Taro Associate Vice President of National Accounts/Field Sales, from February 2014 to March 2014.

197. CW 1 has known Perfetto for about twenty years in the drug industry. CW 1 stated that Perfetto, as well as Aprahamian, "had the authority to raise or lower or do anything with pricing." CW 1 also stated that Aprahamian "helps create and structure pricing".

198. CW1 stated that Perfetto sat on a pricing committee with Defendant Kalb. CW1 also stated that Kalb was involved in, and knew about, pricing issues because CW1 had meetings with Kalb about issues relating to pricing approvals.

199. Aprahamian and Perfetto attended trade industry meetings in April 2013 April 2014, and August 2014.

200. CW 2 was Taro's Pricing and Contracts Analyst from 2013 until early September 2016. In that capacity, CW 2 was responsible for internal pricing, bids and contracts functionality for Taro Pharmaceuticals USA and the Taro sales team. CW2 also conducted key pricing analysis and assessments, including collaborating with counterparts in sales, marketing, finance and supply chain, as well as the pricing committee. During such time, CW2 reported to Alex Likvornik, Taro's Director of Pricing and Contracts from April 2013 until July 2016.

201. CW2 spoke with Perfetto and Aprahamian daily about pricing issues.

202. CW2 stated that management such as sales executives, including Perfetto, Aprahamian, and Likvornik, instructed CW2's team to change drug prices. CW2 also stated that management and sales executives also watched the market, tracking the market shares following the pricing, knowing when to raise and decrease the price.

**3. Defendant Kalb Attended Biweekly Pricing Meetings During the Class Period**

203. CW2 related that there were official Taro pricing meetings every other Monday. The meetings addressed pricing fluctuations. It was the pricing analysts' job to bring pricing issues to management's attention. The meeting attendees included employees from pricing, finance, customer service, and sales. The meetings had 10 to 20 attendees, including Defendant Kalb.

## C. Additional Facts Demonstrating that Taro Fixed Prices on the Drugs

### 1. Markets for the Drugs Are Highly Susceptible To Collusion

#### a. High Degree of Industry Concentration

204. As Plaintiff's economic expert determined, there are numerous features of the market for the Drugs showing that their markets are susceptible to collusion. For example, Plaintiff's expert determined that the price increases and customer allocations at issue here were in markets with a small number of sellers – as is necessary to carry out a price-fixing conspiracy. So too it is easier to monitor adherence to an agreement to fix prices implement a price-fixing conspiracy for a particular product, the major sellers of the product must be part of the conspiracy. Otherwise, companies that are not part of the conspiracy can offer the targeted product at a lower price and take market share from the participants in the conspiracy that are charging supracompetitive prices.

205. The Herfindahl-Hirschman Index ("HHI") is a well-accepted measure of market concentration. HHI is a standard measure of the size of firm concentration in relation to a given industry and an indicator of the amount of competition in that industry. An HHI score of 0 indicates perfect competition whereas a score of 10,000 indicates a monopoly. The DOJ classifies an industry as "concentrated" if the HHI exceeds 1,800 and considers markets in which the HHI is exceeds 2,500 to be "highly concentrated." As illustrated below, the HHI for the Drugs shows very high market concentration:




b. **Sufficient Numbers to Drive Competition**

206. With the numbers of generic competitors on the Drugs, historical fact and accepted economics teaches that – absent collusion – prices would remain at competitive marginal cost levels.

c. **High Barriers to Entry**

207. Markets characterized by high barriers to entry are susceptible to anticompetitive price manipulation. High barriers to entry discourage new potential competitors from entering the market, which allows conspirators to continue charging supracompetitive prices without having their prices undercut and losing market share to new market entrants. Here, prohibitive entry barriers impeded market entry by other manufacturers even though artificially high prices would normally attract market entrants.

208. Pharmaceuticals are heavily regulated by the FDA, and a company must file an ANDA and obtain FDA approval before it may sell a generic pharmaceutical product. The ANDA approval process erects a significant barrier to entry in several ways. First, to obtain FDA approval, a generic manufacturer must conduct costly and time-consuming testing to establish that its product is bioequivalent to the branded product. As Defendant Subramanian explained, the FDA's testing requirements for dermatological products "makes [their] development more expensive and also it takes more time."

209. Second, there is currently a substantial backlog of pending ANDA applications for all generic drugs. In a September 21, 2016 congressional hearing on the FDA's role in the generic drug market, Senator Jerry Moran commented that "there are more than 4,000 generic drug applications currently awaiting approval, and the median time it takes for the FDA to approve a generic is now 47 months or nearly four years." Manufacturers interviewed as part of the GAO Report explained that the "FDA's review backlog may represent a barrier to market entry for new generic drug manufacturers. For example, one manufacturer told us that, while ANDAs are pending at FDA, manufacturers must keep facilities operational, which may be costly for smaller drug manufacturers with fewer plants and products."

210. Third, prospective generic manufacturers must also establish manufacturing processes sufficient to safely produce large amount of bioequivalent product. The manufacturing facilities must follow the FDA's rigorous Current Good Manufacturing Practice regulations. Actavis's former parent company has explained that these standards are constantly evolving, and as a result generic manufacturers must "expend substantial time, money and effort in all production and quality control areas to maintain compliance."

**d. Lack of Substitutes**

211. As determined by Plaintiff's expert, each of the Drugs lacks a ready substitute, further rendering the market for the Drugs susceptible of collusion.

212. For example, as alleged in the antitrust cases, Desonide is a Class VI, mild potency topical corticosteroid used to treat a wide variety of skin conditions, including eczema, psoriasis, and dermatitis. There are typically no substitute drugs that afford patients the same therapeutic benefits as Desonide. As a Class VI corticosteroid, Desonide is much milder than other, more potent topical corticosteroids. It is therefore often used as the first step in treatment before stronger medications are prescribed. There are at most three other corticosteroids in Class VI, and those products have different active ingredients-and thus different therapeutic properties, benefits, and drawbacks-than Desonide.

213. Desonide is often the only effective medicine when indicated. Patients prescribed Desonide by their doctor consider Desonide a medical necessity that must be purchased without regard to an increase in price.

214. Each formulation of Desonide has unique dermatological properties and uses, and the formulations are thus not substitutes for one another. The ointment formulation is, for example, generally considered the strongest delivery mechanism, and is prescribed accordingly. Lotion is often prescribed for ear problems because it does not impair hearing as would cream or ointment formulations. Many other characteristics likewise differentiate the indications and uses for the various Desonide formulations.

215. Desonide is also differentiated from other drug products because of its regulatory status. Desonide Conspirators' Desonide products are not therapeutically equivalent to-or AB-rated with respect to-other drug products, even similar drug products. AB-rated generic versions of a particular drug are therapeutically equivalent to each other because they are all

therapeutically equivalent to the same Reference Listed Drug (RLD). As the FDA explains, "generic products must meet the same exacting specifications as any brand name product." Generic drugs that are AB-rated with respect to one another – including, *e.g.*, Desonide products – therefore share the same active ingredients and lack features that differentiate them from one another, as any differentiating features would preclude them from receiving an AB-rating.

216. Desonide cream is not, for example, therapeutically equivalent to triamcinolone .025% cream, even though both are mild topical corticosteroid creams. As a result, a patient for whom Desonide cream is prescribed could not purchase triamcinolone .025% with the Desonide prescription, regardless of the respective prices of the drugs.

217. The Desonide formulations at issue in this case are also not therapeutically equivalent to, and are not substitutes for, other formulations of Desonide. The sales volume of the gel and lotion formulations (which are not at issue in this case) did not, therefore, experience sustained increased sales volume as a result of Desonide Conspirators' price increases of other formulations.

218. Because Desonide Conspirators' Desonide products are differentiated from other pharmaceutical drug products, and the demand for Desonide Conspirators' Desonide products is inelastic, Desonide Conspirators were able to profitably increase Desonide prices.

219. Similarly, many patients are unable to substitute other medications for Clobetasol. In some cases, Clobetasol is the only effective treatment for certain skin conditions.

220. Likewise, Fluocinonide is a Class II, high potency topical corticosteroid used to treat a wide variety of skin conditions, including eczema, psoriasis, and dermatitis. There are typically no substitute drugs that afford patients the same level of efficacy as Fluocinonide. As a Class II corticosteroid, Fluocinonide is stronger than corticosteroids in Classes III-VII, but

milder than Class I corticosteroids. There are at most four other corticosteroids in Class II, and those products have different active ingredients — and thus different therapeutic properties, benefits, and drawbacks — than Fluocinonide.

221. Fluocinonide is often the only effective medicine when indicated. Patients prescribed Fluocinonide by their doctor consider it a medical necessity that must be purchased without regard to an increase in price.

222. Each formulation of Fluocinonide has unique dermatological properties and uses, and the formulations are thus not substitutes for one another. The ointment formulation is, for example, generally considered the strongest delivery mechanism, and is prescribed accordingly.

223. Many other characteristics likewise differentiate the indications and uses for the various Fluocinonide formulations.

224. Fluocinonide is also differentiated from other drug products because of its regulatory status. The Fluocinonide Conspirators' Fluocinonide products are not therapeutically equivalent to — or AB-rated with respect to — other drug products, even similar drug products. Fluocinonide is not, for example, therapeutically equivalent to halcinonide, even though both are high potency topical corticosteroids. As a result, a patient for whom Fluocinonide is prescribed could not purchase halcinonide with the Fluocinonide prescription, regardless of the respective prices of the drugs.

225. The Fluocinonide formulations at issue in this case are also not therapeutically equivalent to, and are not substitutes for, the solution formulation or the 0.1% cream. The sales volume of the solution formulation, for example, did not experience sustained increased sales volume as a result of Fluocinonide Conspirators' price increases of other formulations.

226. Because Fluocinonide Conspirators' Fluocinonide products are differentiated from other pharmaceutical drug products, and the demand for Fluocinonide Conspirators' Fluocinonide products is inelastic, Fluocinonide Conspirators were able to profitably increase Fluocinonide prices.

227. As to Econozale, while there are other topical drugs under the same code on the market (Act and/or their Therapeutic Characteristics ("ATC") code D01AC (Antifungals for Topical Use /Imaidozole and Triazole Derivatives)) there are significant barriers to change. Econazole is prescribed for a variety of specific health conditions, including tinea, pityriasis versicolor, tinea pedis, dermatophysis and eczema marginatum. Annually, close to a million Americans use Econazole because it is unique in its potency, formulation and effectiveness.

**e. Demand Inelasticity**

228. "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other. For example, demand is said to be "inelastic" if an increase in the price of a product results in only a small decline, if any, in the quantity sold of that product. In other words, customers have nowhere to turn for alternative, cheaper products of similar quality, and so continue to purchase the product despite the price increase.

229. For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices. Otherwise, increased prices would result in declining sales, revenues, and profits as customers purchased substitute products or declined to buy altogether. Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

230. The following chart illustrates the highly inelastic demand of all the Drugs:

## Plus Factor: Price Elasticity of Demand

- A market with a highly inelastic demand can help facilitate cartel behavior as manufacturers have the ability to raise prices without a significant impact on quantity demanded

| Examples | Elasticity of Demand | % Change in Price | % Change in Qd | Elasticity |
|---|---|---|---|---|
| Clobetasol (External Cream) | 0.005 | 1584% | 8% | Highly inelastic |
| Clomipramine (External Capsules) | -0.001 | 1922% | -3% | Highly inelastic |
| Desonide (External Cream) | 0.009 | 627% | 5% | Highly inelastic |
| Econazole (External Cream) | 0.021 | 678% | 14% | Highly inelastic |
| Fluocinonide (External Ointment) | 0.016 | 395% | -6% | Highly inelastic |
| Acetazolamide (Tablet) | -0.001 | 250% | 0% | Highly inelastic |
| Enalapril (Tablet) | 0.000 | 750% | 0% | Highly inelastic |
| (Example) Medical Care and Insurance[1] | -0.80 | 125% | -100% | Relatively inelastic |
| (Example) Public Transportation[1] | -3.50 | 29% | -100% | Highly elastic |

Qd = quantity demanded

[1] *Source: "Demand and Elasticity" Paper, Symphony Health Solutions, Fideres' Calculations*

Taro Price Fixing 1

### f. High Degree of Interchangeability

231. A commodity-like product is one that is standardized across suppliers and allows for a high degree of substitutability among different suppliers in the market. When products offered by different suppliers are viewed as interchangeable by purchasers, it is easier for the suppliers to agree on prices for the product in question and it is easier to monitor these prices effectively.

232. This chart demonstrates that the Drugs, like most generic drugs, are interchangeable:

| Drug Name | Active Ingredients | Strength | Form | Therapeutic Equivalent Code | Application Number | Company |
|---|---|---|---|---|---|---|
| Clobetasol Propionate | Clobetasol Propionate | 0.05% | Cream | AB1 | 74392 | Fougera |
| Clobetasol Propionate | Clobetasol Propionate | 0.05% | Cream | AB1 | 74139 | G & W Labs |
| Clobetasol Propionate | Clobetasol Propionate | 0.05% | Cream | AB1 | 74249 | Taro |
| Cormax | Clobetasol Propionate | 0.05% | Cream | AB1 | 74220 | Hi Tech Pharma |
| Acetazolamide | Acetazolamide | 250MG | Tablet | AB | A040195 | Taro |
| Acetazolamide | Acetazolamide | 250MG | Tablet | AB | A084840 | Lannett |
| Anafranil | Clomipramine | 50MG | Capsule | AB | A074364 | Sandoz Inc |
| Clomipramine | Clomipramine | 50MG | Capsule | AB | A074694 | Taro |
| Clomipramine | Clomipramine | 50MG | Capsule | AB | A074947 | Mylan |
| Econazole Nitrate | Econazole Nitrate | 1% | Cream | AB1 | A076005 | Taro |
| Econazole Nitrate | Econazole Nitrate | 1% | Cream | AB1 | A076075 | Fougera |
| Econazole Nitrate | Econazole Nitrate | 1% | Cream | AB1 | A076479 | Perrigo |
| Econazole Nitrate | Econazole Nitrate | 1% | Cream | AB1 | A076574 | Teligent |
| Enalapril Maleate | Enalapril Maleate | 2.5MG | Tablet | AB | A075480 | Mylan |
| Enalapril Maleate | Enalapril Maleate | 2.5MG | Tablet | AB | A075483 | Wockhardt USA |
| Enalapril Maleate | Enalapril Maleate | 2.5MG | Tablet | AB | A075657 | Taro Pharma |
| Enalapril Maleate | Enalapril Maleate | 5MG | Tablet | AB | A075480 | Mylan |
| Enalapril Maleate | Enalapril Maleate | 5MG | Tablet | AB | A075479 | Teva Pharma |
| Desonide | Desonide | 0.0005 | Cream | AB | A073548 | Taro Pharmaceuticals Usa Inc |
| Desonide | Desonide | 0.0005 | Cream | AB | N017010 | Perrigo New York Inc |
| Fluocinonide | Fluocinonide | 0.0005 | Cream | AB1 | A071500 | Taro Pharmaceuticals Usa Inc |
| Fluocinonide | Fluocinonide | 0.0005 | Cream | AB1 | A072488 | Teva Pharmaceuticals Usa Inc |
| Fluocinonide | Fluocinonide | 0.0005 | Cream | AB | A200735 | Fougera Pharmaceuticals Inc |

233. When purchasers regard different companies' offerings as interchangeable "commodity" products, the companies can more easily agree to fix those products' prices and/or allocate markets and effectively monitor adherence to those agreements, which facilitates the formation and enforcement of a cartel.

234. For example, Clobetasol is a commodity product. Therefore, the Clobetasol Conspirators' products are interchangeable, as they contain the same chemical compounds made from the same raw materials and are therapeutically equivalent. This characteristic facilitates collusion because cartel members can more easily monitor and detect deviations from a price-fixing agreement. In addition, because these are commodity products, all Clobetasol Conspirators had to raise or maintain prices for the cartel to work. Indeed, it was against a Clobetasol Conspirator's individual economic interest, absent a cartel, to raise prices since the other conspirators could have priced below that conspirator's price and taken substantial market share.

235. Desonide Conspirators' Desonide products-like all generic versions of the same drug-are commodity products that are by definition interchangeable. A manufacturer seeking approval to sell a generic version of a drug must file an ANDA with the FDA. An ANDA relies on the scientific findings of safety and effectiveness for the Reference Listed Drug (RLD), which is usually, but not always, the brand name product. The ANDA must also demonstrate that the generic drug contains the same active ingredient(s), dosage form, route of administration, and strength as the RLD, and is absorbed at the same rate and to the same extent as the RLD-that is, that the generic drug is therapeutically equivalent, or "bioequivalent," to the RLD. Generic drugs that are therapeutically equivalent to the RLD receive an "AB" rating from the FDA. The FDA allows minimal variation between the RLD and its AB-rated generics, and the allowed variations are generally limited to non-pharmacological factors such as packaging and expiration period.

236. As alleged above, AB-rated generic versions of a particular drug are therapeutically equivalent to each other because they are all therapeutically equivalent to the same RLD. *See* ¶ 215.

**g. Absence of Competitive Sellers**

237. Companies that are not part of the conspiracy can erode conspirators' market shares by offering products at lower, more competitive prices. This reduces revenue and makes sustaining a conspiracy more difficult.

**h. Opportunities for Contact and Communication Among Competitors**

238. The chart attached as Exhibit A lists the various trade meetings and individuals identified to date as present[10] and the price increases of the Drug(s) in question. The Conspirators are members of trade associations, like GPhA and NACDS, which provide opportunities to conspire. The Conspirators met at numerous meetings preceding unprecedented price hikes. *See* Exhibit A hereto.

239. Taro, Sun, Actavis, Perrigo and Teva have been "Regular Members" of the GPhA.

240. Jim Kedrowski of Sun (Taro's parent), and ex-Interim CEO of Taro, joined the board in 2016 and serves there currently.

241. Several of the Conspirators' high-ranking corporate officers served on GPhA's Board of Directors before and during the relevant time period, including Doug Boothe, then-President and CEO of Actavis, who was on the Board in 2012. From 2013-2015, Boothe served on the Board, but as Executive Vice President and General Manager of Perrigo. Charlie Mayr, Global Chief Communications Officer of Actavis, Inc. served on the Board in 2013. Perrigo's Richard Stec joined the GPhA Board in 2016. Debra Barrett, Senior VP, Global Government

[10] Some of the information herein as to what companies and/or individuals were present at each meeting was alleged in various private antitrust complaints. Discovery will expand on what other Conspirators and representatives were present at these meetings. As noted, because many generic drug manufacturers are members and/or regular attendees of GPhA and NACDS meetings, more companies and individuals were present than those listed.

Affairs & Public Policy for Teva, served on the Board in 2012, 2013, 2015, and 2016, and Allan Oberman, President and CEO of Teva Americas Generics, served on the Board in 2014.

242. Likewise, the 2017 regular GPhA (now AAM, the Association for Accessible Medicines) members includes many Conspirators, including Mayne, Mylan, Sandoz, Sun, and Teva.

243. Mylan and Taro have also had employees sit on the GPhA board since at least 2010.

244. In addition to common membership in the GPhA and the NACDS, many Conspirators are involved in an array of buyer-side industry groups, through which they can share pricing strategies, bid terms, market allocation, and other competitively sensitive information. The Minnesota Multistate Contracting Alliance for Pharmacy ("MMCAP") is a group purchasing organization operated by the State of Minnesota's Department of Administration. According to its website, "MMCAP member facilities purchase over $1 billion per year and have national account status with all of the major brand name and generic pharmaceutical manufacturers."

245. Generic pharmaceutical manufacturers are vendors for the MMCAP. For instance, in 2014, Mark Blitman, Executive Director of Sales for Government Markets for Actavis, and Nick Gerebi, Director of National Accounts for Teva, served as vendors for the MMCAP.

246. The Health Care Supply Chain Association is a trade association that represents group purchasing organizations, such as the MMCAP, and hosts events for the generic pharmaceutical industry. Executives from both Actavis and Teva participated in the Health Care

Supply Chain Association's LogiPharma Supply Chain Conference on September 16-18, 2014 in Princeton, New Jersey.

247. At the National Pharmacy Forum, speaker topics included: “current pricing and spending trends”; “a critique of the rationale for high prices offered by manufacturers”; and “the U.S. pharmaceutical market and the ongoing changes within the pharmaceutical world,” including “market trends.”

248. In addition, several Fluocinonide Conspirators are involved in other industry groups through which they had the opportunity to conspire. For example, the Efficient Collaborative Retail Marketing (ECRM) group offers “Efficient Program Planning Sessions,” which, according to the ECRM website, are “made up of one-on-one strategic meetings that connect decision makers in an effort to maximize time, grow incremental sales and uncover industry trends.”

249. In addition to providing an opportunity to share information about the generic pharmaceutical business, these trade association events often include recreational and social activities such as golfing, theater performances, cocktail parties, and dinners, which allowed, *e.g.*, Fluocinonide Conspirators’ executives to interact with their competitors privately and outside the traditional business setting.

250. The Conspirators’ common membership in trade associations such as the GPhA and the NACDS, among others, and the attendance of industry executives, including those identified above, gave the Conspirators ample opportunities to exchange information concerning the pricing of their products.

251. The DOJ and 20 state Attorneys General are analyzing trade associations like GPhA and NACDS as a potential avenue for facilitating collusion between different generic drug

manufacturers as part of their respective investigations into anticompetitive pricing and customer allocation agreements.

252. These meetings, among other contacts among the Conspirators, provided them with opportunities to collude, and at these meetings the Conspirators agreed to increase pricing for the Drugs.

253. In addition to these frequent conferences and trade shows, representatives of generic drug manufacturers get together separately, in more limited groups, allowing them to further meet face-to-face with their competitors and discuss their business. A large number of generic drug manufacturers, including several of the Conspirators, have offices in close proximity to one another in New Jersey or New York, giving them easier and more frequent opportunities to meet and collude. In fact, high-level executives of many generic drug manufacturers get together periodically for what at least some of them refer to as “industry dinners.”

254. As a result of these various interactions, generic drug companies’ sales and marketing executives are often acutely aware of their competition and, more importantly, each other's current and future business plans. This familiarity and opportunity often leads to agreements among competitors to fix prices or to allocate a given market so as to avoid competing with one another on price.

255. Generic drug companies routinely communicate and share information with each other about bids and pricing strategy. This can include forwarding bid packages received from a customer (e.g., a Request for Proposal or “RFP”) to a competitor, either on their own initiative, at the request of a competitor, or by contacting a competitor to request that the competitor share that type of information.

256. These companies also share information regarding the terms of their contracts with customers, including various terms relating to pricing, price protection and rebates. Generic drug manufacturers use this information from their competitors to negotiate potentially better prices or terms with their customers, which could be to the ultimate detriment of consumers.

257. In addition to providing an opportunity to share information about the generic pharmaceutical business, these trade association events often include recreational and social activities such as golfing, theater performances, cocktail parties, and dinners, which allowed Conspirators' executives to interact with their competitors privately and outside the traditional business setting.

258. The NACDS also hosts its annual "Total Store Expo," which according to the NACDS website, is "the industry's largest gathering of its most influential leaders. It is a combination of both strategic and tactical business meetings between existing and new trading partners and is attended by industry decision makers."

**i. Absence of Departures from the Markets**

259. There were no departures from the market that could explain the price increases, and therefore, departures from the market cannot explain the Conspirators' supra-competitive prices.

**j. Absence of Competitive Sellers**

260. Companies that are not part of the conspiracy can erode conspirators' market shares by offering products at lower, more competitive prices.

**k. Size of the Price Increases**

261. The magnitude of the price increases here is staggering. As alleged above, the price increases for the Drugs at issue differentiate them from mere parallel price increases. Oligopolists seeking to test price increases, where there is no significant change in supply or

demand indicators, usually need to take measured approaches. But here the increases are not 5% or even 10% jumps – the increases are, in just one act, often double, triple or more the current price of the product. A rational oligopolist, when unaided with the certainty that its ostensible competitors would follow, would not make such huge price increases.

**l. Departure from Their Historic Pricing Practices**

262. Absent collusion or some alternate explanation, prices within a market generally fall as a result of competition and eventually stabilize at the lowest profitable price.

263. In addition, when a pharmaceutical company increases prices, it must often pay significant fees and chargebacks to customers with which the company has contracts that include specific pricing terms. Indeed, this is precisely what happened here as Taro had to pay $50 million in 'break costs' in the summer of 2014.

264. Taro's parent company, according to its 2015 20-F, incurred approximately $47 million in chargebacks for the year ended March 2015, approximately $24 million more than those in the year ended March 2014. Perrigo's parent company, for example, stated in its 2014 10-K filing that it paid $218 million more in chargebacks for the year ended June 2014 (the first year of Desonide price increases) than it did the prior year.

265. Thus, by raising prices, the Desonide Conspirators risked both losing market share and incurring significant additional costs. It would have only been rational for these conspirators to raise prices had they known that it would be highly profitable to do so because their competitors also would increase prices without looking to undercut them.

**m. Reimbursement of Generic Drugs**

266. The reimbursement for generic pharmaceuticals to retail pharmacies is limited by MAC pricing, which is based on the lowest acquisition cost for each generic pharmaceutical paid by retail pharmacies purchasing from a wholesaler for each of a pharmaceutical's generic

equivalent versions. As a result, the usual inhibitions of an oligopolist to unilaterally raise price are embedded in the generic reimbursement system. In the absence of coordinated pricing activity among generic manufacturers, an individual generic manufacturer cannot significantly increase its price without incurring the loss of a significant volume of sales. However, when one observes significant generic price increases – particularly those of the kind alleged here – basic market economics dictates that the generic drug makers likely had an expectation that they would not lose volume (based on their expectations of what their ostensible competitors would do) – because they colluded.

**n. The Conspirators Acted Against Their Unilateral Self Interest Absent a Cartel**

267. In a competitive market, sellers have incentives to cut prices to maintain or increase market share. As a result, generic drug prices typically decline over time. It would be economically irrational for an individual seller to drastically increase prices without assurances that its rivals would do the same. Absent such assurances, the seller would risk a loss of market share that would more than offset the higher prices it was charging.

268. The GAO, in preparing its generic drug pricing report, interviewed five generic drug manufacturers. The manufacturers explained that a competitive generic market "operates like a commodities market" and that "they are asked to submit a proposal offering their best possible price to their customers-for example, companies that operate pharmacies or wholesalers. If another manufacturer offers a lower price to a customer, manufacturers we interviewed indicated that they are usually asked to match it or risk losing market share to the other manufacturer." According to the generic drug manufacturers that were interviewed, these factors create a "competitive threat that serves as an incentive to keep prices low."

269. In a competitive market, sellers have incentives to cut prices to maintain or increase market share. As a result, generic drug prices typically decline over time. It would be economically irrational for an individual seller to drastically increase prices without assurances that its rivals would do the same. Absent such assurances, the seller would risk a loss of market share that would more than offset the higher prices it was charging.

270. The risk of losing market share as a result of a unilateral price increase is particularly acute with respect to commodity products like Desonide, because the only material difference among commodity products sold by different companies is price. The GAO, in preparing its generic drug pricing report, interviewed five generic drug manufacturers. The manufacturers explained that a competitive generic market "operates like a commodities market" and that "they are asked to submit a proposal offering their best possible price to their customers-for example, companies that operate pharmacies or wholesalers. If another manufacturer offers a lower price to a customer, manufacturers we interviewed indicated that they are usually asked to match it or risk losing market share to the other manufacturer." According to the generic drug manufacturers that were interviewed, these factors create a "competitive threat that serves as an incentive to keep prices low." Absent collusion, increasing prices in a competitive environment that incentivized keeping prices low was against each conspirator's independent economic self-interest.

**o. Motive to Conspire**

271. Generic drug prices for Medicare Part D fell 59% between 2010 and the second quarter of 2015. In 2013 alone, the overall prices for dermatological drugs decreased by 6.9%.

272. The declines in generic drug prices had a negative impact on Conspirators' revenues because a substantial portion of their businesses are devoted to the sale of generic

drugs. According to the AARP Study, the average prices for Taro, Actavis, and Teva generic products considered in the study decreased by 13.3%, 12.1%, and 8.4% respectively in 2013.

273. The desire to regain revenues lost to falling prices of generic drugs, and dermatological drugs in particular, provided the Conspirators with ample motive to conspire. A June 27, 2014, Credit Suisse analysis explained, for example, that Taro's pipeline of new products had been weak, and that Taro therefore needed price increases to drive its growth. As Richard Evans, Scott Hinds and Ryan Baum at Sector & Sovereign Research explained in a report dated April 21, 2015: "A plausible explanation is that generic manufacturers, having fallen to near historic low levels of financial performance are cooperating to raise the prices of products whose characteristics - low [revenues] due to either very low prices or very low volumes - accommodate price inflation."[11]

274. The Conspirators were motivated to act collectively, instead of individually, because any unilateral price increase would have faced a dramatic drop in sales that would have offset that conspirator's price increase.

## D. Taro and Many of Its Conspirators Are the Subject of Extensive Government Investigations

### 1. The DOJ and Congress Are Investigating How Generic Drug Companies, Including Taro, Fixed Prices at Trade Association Meetings

275. In light of massive generic drug price increases, on January 8, 2014, the CEO of the National Community Pharmacist Association wrote a letter to Congress requesting an oversight hearing to determine the causes of the price jumps.[12]

---

[11] *Available at* http://www.ssrllc.com/publication/abccahmck-us-generic-inflation-continues-in-1q15.

[12] *See* https://www.ncpanet.org/pdf/leg/jan14/letter-generic-spikes.pdf.

276. On October 2, 2014, U.S. Senator Bernie Sanders and U.S. Congressman Elijah Cummings sent letters to several generic drug manufacturers, including Sun, which controls Taro, asking for detailed information on their generic drug price increases.[13]

277. On November 20, 2014, Senator Sanders's committee held a hearing entitled "Why Are Some Generic Drugs Skyrocketing In Price?"[14] Various witnesses discussed the price increases for generic drugs. No chief executive of a generic drug manufacturer testified.

278. In 2014, the Antitrust Division of the DOJ commenced a wide-ranging criminal investigation into generic drug manufacturers' marketing and pricing practices, and has caused grand jury subpoenas to be issued to various generic drug manufacturers, including Taro, in connection with the investigation.

279. In connection with its investigation, the DOJ is looking closely at trade associations. As discussed below, the DOJ (as well as the State AG office) has alleged, in detail, how several companies fixed prices at trade association meetings.

280. According to an intelligence report from Policy and Regulatory Report, a source that was given inside information by someone with knowledge of the government's generic pricing investigation, the DOJ is looking closely "at trade associations as part of their investigation as having been one potential avenue for facilitating the collusion between salespeople at different generic producers."[15]

---

[13] https://democrats-versight.house.gov/sites/democrats.oversight.house.gov/files/documents/Letter%20to%20Sun%20Pharmaceutical.pdf.

[14] Why Are Some Generic Drugs Skyrocketing in Price? (Nov. 20, 2014), https://www.help.senate.gov/imo/media/doc/Schondelmeyer.pdf.

[15] Eric Palmer, *DOJ criminal probe takes a look at trade associations*, Fierce Pharma (July 10, 2015), http://www.fiercepharma.com/regulatory/doj-criminal-probe-takes-a-look-at-trade-associations

281. At these various conferences and trade shows, representatives from Taro and its Conspirators had opportunities to interact with each other and discuss their respective businesses and customers. Attendant with many of these conferences and trade shows are organized recreational and social events, such as golf outings, lunches, cocktail parties, dinners, and other scheduled activities that provide further opportunity to meet with competitors outside of the traditional business setting. *See* AG Complt. ¶51. Generic drug manufacturer representatives who attend these functions use these opportunities to discuss and share upcoming bids, specific generic drug markets, pricing strategies, and pricing terms in their contracts with customers, among other competitively-sensitive information.

282. These trade shows and customer conferences provided generic drug manufacturers with ample opportunity to meet, discuss, devise, and implement a host of anticompetitive schemes that unreasonably restrain competition in the United States' market for generic drugs.

**2. The DOJ Serves Subpoenas on Taro, As Well As Numerous Conspirators**

283. On September 9, 2016, Taro disclosed in a Form 6-K that "Taro Pharmaceuticals, U.S.A., Inc. . . . as well as two senior officers in its commercial team, received grand jury subpoenas from the United States Department of Justice, Antitrust Division, seeking documents relating to corporate and employee records, generic pharmaceutical products and pricing, communications with competitors and others regarding the sale of generic pharmaceutical products, and certain other related matters."

284. The following Conspirators also received subpoenas from the DOJ or had their premises searched:

1. Lannett Company, Inc. received a grand jury subpoena on December 5, 2014.

2. Sandoz, Inc. received a subpoena from the DOJ in March 2016.

3. Sun Pharmaceutical Industries Ltd received a subpoena from the DOJ on May 28, 2016.

4. Teva USA received a subpoena from the DOJ on June 21, 2016 according to a 6-K filed on November 15, 2016 by Teva Pharmaceutical Industries Ltd.

5. Mylan received subpoenas from the DOJ in December 2015.

6. Perrigo Company PLC announced on May 2, 2017 that search warrants were executed at the Company's corporate offices.

285. The fact that the DOJ served Taro with a subpoena after many other Conspirators demonstrates that Taro is likely an important part of the growing evidence in the government's case.

286. In total, the DOJ has thus far served subpoenas on Taro and six of its co-Conspirators.

**3. The DOJ Action**

287. On December 14, 2016, the DOJ unsealed criminal Informations against two former senior executives of generic drug manufacturer Heritage Pharmaceuticals Inc. for violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, for their roles in conspiracies to fix prices, rig bids, and allocate customers for certain generic drugs (Glyburide and Doxycycline Hyclate DR). The criminal actions are styled *United States v. Glazer* (2:16cr00506-RBS) and *United States v. Malek* (2:16cr00508-RBS), and are pending in the U.S. District Court for the Eastern District of Pennsylvania.

288. Malek and Glazer have now entered plea agreements admitting that between April 2013 through December 2015, each engaged in a conspiracy to allocate customers, rig bids, and

fix and maintain prices of doxycycline hyclate, and a similar conspiracy between April 2014 and December 2015 concerning glyburide. Their plea agreements provide for cooperation in any federal investigation involving violations of criminal and antitrust law concerning "the production and sale of generic pharmaceuticals in the United States." In exchange, the government promised immunity from criminal prosecution regarding doxycycline hyclate, glyburide, or any generic pharmaceutical product enumerated on a list filed under seal.

289. As discussed below, the government has stated that the DOJ is reportedly preparing additional cases involving other generic drugs. *See infra* ¶¶303-304.

**4. The State AG Action**

290. On December 14, 2016, the State of Connecticut and nineteen other states filed an original complaint – amended on March 1, 2017 to include twenty additional states – against six generic drug manufacturers for illegal schemes involving market share allocation and anticompetitive price inflation (the "State AG Action"). The State AG Action, notably, includes defendants Mylan Pharmaceuticals USA, Inc. and Teva Pharmaceuticals USA, Inc. – two companies that colluded with Taro.[16]

291. According to the State AG Action, generic drug manufactures, like Taro and its Conspirators, operate through their respective senior leadership and marketing and sales executives, in a manner that fosters and promotes routine and direct interaction among their competitors. Generic drug manufacturers exploited their interactions at various and frequent industry trade shows, customer conferences and other similar events, to develop relationships and sow the seeds for their illegal agreements. The anticompetitive agreements are further

[16] Complaint, *Connecticut v. Aurobindo Pharma USA, Inc.*, No. 3:16-cv-02056-VLB (D. Conn. Dec. 14, 2016), ECF No. 1; Amended Complaint, *Connecticut v. Aurobindo Pharma USA, Inc.*, No. 3:16-cv-02056-VLB (D. Conn. Mar. 1, 2017), ECF No. 168.

refined and coordinated at regular "industry dinners", "girls nights out", lunches, parties, and numerous and frequent telephone calls, emails and text messages.

292. According to the State AG Action, the information developed through its investigation (which is still ongoing) uncovered evidence of a broad, well-coordinated and long-running series of schemes to fix the prices and allocate markets for a number of generic pharmaceuticals in the U.S. Although the State AG Action focuses on Glyburide and Doxycycline Hyclate DR, it alleges that the States have uncovered a wide-ranging series of conspiracies implicating numerous different drugs and competitors.

293. Connecticut State Attorney General George Jepsen stated the following about the AG Action:

> My office has dedicated significant resources to this investigation for more than two years and has developed compelling evidence of collusion and anticompetitive conduct across many companies that manufacture and market generic drugs in the United States," said Attorney General Jepsen. "While the principal architect of the conspiracies addressed in this lawsuit was Heritage Pharmaceuticals, *we have evidence of widespread participation in illegal conspiracies across the generic drug industry*. Ultimately, it was consumers - and, indeed, our healthcare system as a whole - who paid for these actions through artificially high prices for generic drugs. We intend to pursue this and other enforcement actions aggressively, and look forward to working with our colleagues across the country to restore competition and integrity to this important market." (Emphasis added).[17]

294. New York Attorney General Eric T. Schneiderman echoed Jepsen's sentiments:

> Lawsuit Alleges Widespread Conspiracy Among Competitors To Reduce Competition, Increase Prices For Generic Prescription Drugs . . .
>
> The investigation, which is still ongoing as to a number of additional generic drugs, uncovered evidence of a broad, well-coordinated and long running series of

[17] *Connecticut Leads 20 State Coalition Filing Federal Antitrust Lawsuit against Heritage Pharmaceuticals, other Generic Drug Companies* (Dec. 15, 2016), *available at*, http://www.ct.gov/ag/cwp/view.asp?Q=588538&A=2341.

> conspiracies to fix prices and allocate markets for certain generic pharmaceuticals in the United States.[18]

295. As reported by The New York Times on December 15, 2016, in an interview about the State AG Complaint, Jepsen stated that there was more to come:

> "We believe that this is just the tip of the iceberg," George C. Jepsen,
>
> Connecticut's attorney general, whose office started the inquiry that led to the charges, said in an interview on Thursday. "I stress that our investigation is continuing, and it goes way beyond the two drugs in this lawsuit, and it involves many more companies than are in this lawsuit."[19]

**5. The DOJ Intervened in Private Antitrust Cases Against Taro, Demonstrating That Taro Is An Important Part of the DOJ Investigation**

296. The DOJ intervened in a consolidated private antitrust case against, inter alia, Taro in January 2017. That case, *In re Topical Corticosteroids Antitrust Litigation*, 1:16-mc-07000 (Pauley, J.), alleged that Taro and other companies fixed prices on three of the seven Drugs, Clobetasol, Desonide, and Fluocinonide.

297. In November 2016, various plaintiffs moved to obtain limited discovery including the subpoena the DOJ served on Taro in September 2016, as well as communications relating to the subpoena.

298. On December 22, 2016, the court ordered Taro to "make an initial limited document production consisting of the September 8, 2016 subpoenas from the Department of Justice, Antitrust Division to Taro Pharmaceuticals Industries, Ltd. and its employees, together

---

[18] *A.G. Schneiderman Files Federal Antitrust Lawsuit With 19 Other States Against Heritage Pharmaceuticals And Other Generic Drug Companies*, *available at* https://ag.ny.gov/press-release/ag-schneiderman-files-federal-antitrust-lawsuit-19-other-states-against-heritage.

[19] Katie Thomas, *20 States Accuse Generic Drug Companies of Price Fixing*, N.Y. Times (Dec. 15, 2016), https://www.nytimes.com/2016/12/15/business/generic-drug-price-lawsuit-teva-mylan.html?_r=0.

with any written responses and related communications between the Department of Justice and Taro Pharmaceuticals Industries, Ltd. by January 5, 2017."[20]

299. After extending the response deadline, the DOJ contacted plaintiffs and requested more time to respond to the court's order.

300. On February 22, 2017, the court ordered that the DOJ could intervene with respect to the Court's order that Taro produce subpoenas and related communications. The court also extended the time for Taro to produce the subpoenas and related communications to March 31, 2017.[21]

301. On March 10, 2017, plaintiffs suspended their request for the Taro subpoenas and related communications with the DOJ. In a letter to the Court, Plaintiffs stated:

> **Taro subpoenas and related communications with DOJ**. In Amended Master Case Order No. 1, the Court directed Defendant Taro Pharmaceuticals Industries, Ltd. to produce subpoenasand communications with the DOJ by January 26, 2017. ECF No. 27 ¶ 28.1 When DOJ intervened and advised that it believed that Taro's production of the documents could interfere with DOJ's ongoing criminal investigation, the Court extended Taro's deadline for production to March 31, 2017. ECF No. 26. DOJ has advised that it continues to object to the Taro production. In consideration of the further agreements set forth below, Plaintiffs agree not to seek enforcement of the Court's order at this time and propose that Taro's compliance with Amended Master Case Order No. 1 be adjourned pending further order of the Court.

302. The DOJ intervention in a private antitrust case against Taro demonstrates that Taro is a key part of the ongoing DOJ case.

### 6. The DOJ Intervenes in Another Generic Drug Case

303. Another generic antitrust action entitled *In re Propranolol Antitrust Litigation* (S.D.N.Y. 16-cv-09901 (JSR)) was pending in this district before it conditionally was transferred

[20] Master Case Order No. 1, *In re Topical Corticosteroid Antitrust Litigation*, No. 1:16-MC-07000 (S.D.N.Y. Dec. 22, 2017), ECF No. 1.
[21] Stipulation and Order, *In re Topical Corticosteroid Antitrust Litigation*, No. 1:16-MC-07000 (S.D.N.Y. Feb. 22, 2017), ECF No. 12.

to an MDL in E.D. Pa. on April 12, 2017.[22] Before the case was transferred, the DOJ moved to stay discovery in the action on February 24, 2017.[23] In its motion, the DOJ emphasized the broad-ranging nature of its ongoing investigation, the "numerous corporations and individuals" implicated, and the "plethora of evidence" amassed against these corporations and individuals:

> The Complaints refer to the United States' criminal investigation into the generic pharmaceutical industry as part of the factual basis for their antitrust claims. . . .
>
> The United States unsealed the first criminal informations in that investigation on December 14, 2016. . . . The two executives – Jeffrey Glazer and Jason Malek – pled guilty to these charges on January 9, 2017, and both are cooperating with the United States' ongoing criminal investigation.
>
> Although, to date, the United States has filed charges against only Glazer and Malek, as described in this Memorandum and detailed more fully in the Grundvig Declaration, the criminal investigation into the generic pharmaceuticals industry is ongoing and broad-ranging, and it has already implicated numerous corporations and individuals. Additional corporations and individuals may be implicated as the investigation continues to develop.
>
> * * *
>
> Thus, absent a stay, discovery in these cases would sweep up evidence related to other drugs that the United States is currently investigating.
>
> [T]he United States is conducting sensitive negotiations with potential criminal defendants and has a considerable interest in limiting sworn testimony given by its cooperators.

304. The DOJ intervention in another case, particularly its statement that it "has already implicated numerous corporations and individuals" beyond Heritage and the two individuals charged, demonstrates that other indictments are forthcoming.

---

[22] Most of the antitrust cases mentioned in ¶308, have been conditionally transferred to the same MDL.

[23] Memorandum of Law In Support of The United States' Motion For Reconsideration of Its Motion for A Limited Stay of Certain Discovery, *In re Propanolol Antitrust Litigation*, No. 1:16CV09901 (S.D.N.Y. Feb. 24, 2017), ECF No. 102.

**7. Propranolol Case Sustained**

305. Significantly, the Propranolol case was recently sustained. The plaintiffs in the Propranolol case alleged that defendants Actavis Elizabeth, LLC (whose related entity, Actavis, conspired with Taro to raise Clobetasol and Desonide prices), Mylan Inc. (who conspired with Taro to raise Clomipramine and Enalapril prices), as well as UDL Laboratories Breckenridge Pharmaceuticals, Inc., Upsher-Smith and Pliva, Inc. conspired to raise prices on Propranolol tablets and capsules.

306. Judge Rakoff recently denied defendants' motion to dismiss.[24] Several of his holdings are significant:

> The pleadings extensively recount defendants' participation in trade association meetings taking place over a number of years and list the dates of such conferences, the names of the attendees from each defendant, and their respective job titles…. The pleadings further allege that the defendants' representatives had 'discussions' at these meetings,…and, quoting a recent civil complaint brought by 20 state attorney generals, that 'generic drug manufacturer representatives who attend these functions, use these opportunities to discuss and share upcoming bids, specific generic drug markets, pricing strategies and pricing terms in their contracts with customers, among other competitively sensitive information…'
>
> * * *
>
> [The Court] finds that plaintiffs have plausibly alleged that the price increases in Propranolol capsules and tablets were against defendants' self-interest…
>
> Taken as a whole, the plus factors alleged in the consolidated amended complaints plausibly establish that the defendants illegally conspired to fix the prices of Propranolol capsules and tablets in 2013 and 2015.

307. The fact that a federal judge has sustained a complaint naming two of the Conspirators, and whose allegations mirror those here ("extensively recount[ing] defendants' participation in trade association meetings taking place over a number of years and list the dates

---

[24] Opinion and Order, *In re Propanolol Antitrust Litigation*, No. 1:16CV09901 (S.D.N.Y. April 6, 2017), ECF No. 92.

of such conferences, the names of the attendees from each defendant, and their respective job titles" is significant.

## E. There Are 85 Antitrust Suits Against Generic Drug Companies – With 43 Naming Taro as a Defendant

308. Plaintiffs, mostly pension funds, have filed dozens of cases alleging that Taro fixed prices on various generic drugs. Taro is a defendant in more than half (43). *See* Exhibit B.

309. Taro is at the heart of these myriad private lawsuits as the Company is named as a defendant in more than half the cases – more than any other company.

## F. Defendants' Materially False and Misleading Statements

310. On July 3, 2014, the first day of the Class Period, Taro filed its annual report on Form 20-F, which was signed by Kalb. In the report, Taro stated that it was part of a normal competitive environment:

> **Competition and Pricing**
>
> *The pharmaceutical industry is intensely competitive*. *We compete with the original manufacturers of the brand-name equivalents of our generic products, other generic drug manufacturers (including brand-name companies that also manufacture generic drugs or license their products to other generic drug manufacturers) and manufacturers of new drugs that may compete with our generic drugs*. Many of our competitors have greater financial, production and research and development resources, substantially larger sales and marketing organizations, and substantially greater name recognition than we have.
>
> Historically, brand-name drug companies have attempted to prevent generic drug manufacturers from producing certain products and to prevent competing generic drug products from being accepted as equivalent to their brand-name products. We expect such efforts to continue in the future. Also, some brand-name competitors, in an attempt to participate in the generic drug sales of their branded products, have introduced generic equivalents of their own branded products, both prior and subsequent to the expiration of their patents or FDA exclusivity periods for such drugs. These competitors have also introduced authorized generics or generic equivalents of brand-name drug products.

311. By virtue of the facts alleged in paragraphs 77-309, the italicized statements referenced above were materially false and misleading because Taro fixed the Drugs' prices with

the Conspirators, rendering their statements about the purported competition Taro drugs face and that they "compete[d]…with other generic drug manufacturers" materially false and misleading.

312. The 20-F report also falsely stated that Taro was competing with several companies with whom they were colluding:

> *In the United States, we compete with branded pharmaceutical manufacturers such as Bristol-Myers Squibb Company, GlaxoSmithKline Inc., Merck & Co., Inc., Novartis AG, Pfizer Inc., Valeant Pharmaceuticals International, Inc. and Galderma Laboratories, LP., as well as with generic companies such as Teva Pharmaceuticals U.S.A., Mylan Inc., Perrigo Company PLC, Glenmark Generics, Inc., USA. and Sandoz Pharmaceuticals (the generics subsidiary of Novartis).* Many of these companies have more resources, market and name recognition and better access to customers than we have. Therefore, there can be no assurance that we can compete successfully with them.

313. This statement was materially false and misleading for the reasons given in paragraph 311, and because Taro was colluding with Teva, Mylan, Perrigo, and Sandoz at the time of these statements.

314. On November 10, 2014, Taro held its 2Q15 conference call with analysts. On the call, Subramanian stated that "Taro's sales and earnings growth *is attributable to upward price adjustments and a prudent lifecycle management of our product portfolio*, while our overall volumes remained relatively constant and we remain conscious about the long-term sustainability of these prices."

315. This italicized statement was materially false and misleading because Taro's collusion to fix the price of one or more of the Drugs, in particular, Clobetasol, was a significant source and cause of Taro's second quarter 2014 earnings growth, rather than independent "upward price adjustments and a prudent lifecycle management of [Taro's] product portfolio."

316. Subramanian misrepresented why Taro's 2Q14 sales increased again later in the same call:

Sameer Baisiwala - Morgan Stanley – Analyst

> Thank you very much and thanks for doing this call, first time. It's now 4 or 5 years since Sun has acquired. Again, for the first time, would Taro be taking up the practice of issuing the full-year guidance, the way Sun Pharma does? And if so, what is that for this year?
>
> Dilip Shanghvi - Taro Pharmaceutical Industries Ltd. - Chairman
>
> Kal, maybe you can respond.
>
> Kal Subramanian - Taro Pharmaceutical Industries Ltd. - CEO
>
> I don't think we have plans to give forward guidance for the simple reason, as we explained, *much of the sales increase is attributable to price adjustments*. *Given the uncertain nature of the market*, it will be difficult for us to give guidance.

317. The italicized statement was materially false and misleading because the sale increase was attributable to Taro colluding to fix, and fixing, the price of one or more of the Drugs, in particular, Clobetasol, which was a significant source and cause of Taro's second quarter 2014 earnings growth, rather than to independent upward "price adjustments." Additionally, characterizing the market for the Drug sales as "uncertain" was materially false and misleading because Taro colluded with other manufacturers to fix the Drug prices.

318. Later on the same call, Subramanian discussed competition and the sustainability of Taro's increased prices:

> *We remain cautious of the increasing competition and major customer and industry consolidation, and the potential impact of both, which can impact our sustainability of our product prices.* These factors create additional challenges in maintaining our current performance, *given ever-changing market dynamics*, in particular the creation of buying alliances between major wholesalers and retail pharmacy chains.

319. The italicized language was materially false and misleading because (i) Taro's price fixing fundamentally affected its competition with other generic drug manufacturers; and (ii) the prices of several of Taro's key drugs, including Clobetasol, were "sustain[ed]" by the Company's anti-competitive price fixing.

320. During the call, Subramanian discussed Taro's experience with price increases:

**Sudarshan Padmanabhan** - Sundaram Mutual Funds - Analyst

No, no, I am talking more generally, in the sense that would companies, other companies, be inhibited to take price hikes because now the Congress is talking about pricing, I mean. Which is more generally, not specifically from Taro or any specific companies.

**Dilip Shanghvi** - Taro Pharmaceutical Industries Ltd. - Chairman

Kal, you want to respond?

**Kal Subramanian** - Taro Pharmaceutical Industries Ltd. - CEO

Sure. Generics remain --

**Dilip Shanghvi** - Taro Pharmaceutical Industries Ltd. - Chairman

I mean if you want --

**Kal Subramanian** - Taro Pharmaceutical Industries Ltd. - CEO

-- a lot more, what do you say, value for money or cost competitive when it comes to the payers and patients. Generic companies, by and large, will have a larger portfolio. And some of the products, depending upon the competitive intensity, prices will be lower; some of them, when they see a short-term opportunity, prices go up. As I understand, US is basically a free market, *and our own evidence is, what do you say, with a change in prices, with increase in prices, competitive intensity also increases*. That is also better for the market. So -- but it will be very difficult for anybody to predict what the Congress will do. *There is a very strong market mechanism* which we believe is fully in operation, and the generics continue to accrue value to the patient and payers.

321. The italicized statements were materially false and misleading because Taro's collusive price fixing of the Drugs was the result of cooperation not competitive intensity. Also, a "very strong market mechanism" did not exist because Taro and the Conspirators were fixing prices of the Drugs at the time.

322. On a May 28, 2015 conference call, Subramanian again misrepresented the source and cause of Taro's earnings growth:

Kal Subramanian - Taro Pharmaceutical Industries Ltd. - CEO

During the last call, I highlighted several significant accomplishments over four years. In 2014/2015, we accomplished a few more. According to IMS data, Taro

> continues to be the number one genetic dermatology company in the US in terms of sales, as it has for the past four years. The US continues to be the major market for us.
>
> Our key financial metrics continue to show a healthy growth. Taro has successfully rolled out a patient assistance program in an effort to provide medication to qualifying individuals. These programs aim to provide needy individuals with access to some of our medications. We successfully navigated the key customer consolidations which took place this year. However, this will continue to be a challenge as we move forward.
>
> As a result of these consolidations, we have experienced pricing pressures. We are pleased to present this quarter results and with the consistent progress we have made. *Taro's sales and earnings growth is attributable to the prudent lifecycle management support product portfolio*.

323. The italicized statement was materially false and misleading for the reasons given in 315.

324. On July 1, 2015, Taro filed its annual report for fiscal year 2014 on Form 20-F, which was signed by Defendant Kalb. The report provided, in pertinent part:

> Competition and Pricing
>
> *The pharmaceutical industry is intensely competitive. We compete with the original manufacturers of the brand-name equivalents of our generic products, other generic drug manufacturers (including brand-name companies that also manufacture generic drugs or license their products to other generic drug manufacturers) and manufacturers of new drugs that may compete with our generic drugs*. Many of our competitors have greater financial, production and research and development resources, substantially larger sales and marketing organizations, and substantially greater name recognition than we have….
>
> In the United States, we compete with branded pharmaceutical manufacturers such as Bristol-Myers Squibb Company, GlaxoSmithKline Inc., Merck & Co., Inc., Novartis AG, Pfizer Inc., Valeant Pharmaceuticals International, Inc. and Galderma Laboratories, LP., as well as with generic companies such as Teva Pharmaceuticals U.S.A. *Mylan Inc., Perrigo Company PLC, Glenmark Generics, Inc., USA. and Sandoz Pharmaceuticals (the generics subsidiary of Novartis).* Many of these companies have more resources, market and name recognition and better access to customers than we have. Therefore, there can be no assurance that we can compete successfully with them….

325. The italicized statements were materially misleading for the reasons given in 311 and 313.

326. The July 1, 2015 20-F also provided as follows:

> **YEAR ENDED MARCH 31, 2015 COMPARED WITH YEAR ENDED MARCH 31, 2014**
>
> *Sales*. For the year ended March 31, 2015, sales increased $103.7 million, or 13.7%, compared to the same period in 2014. Sales in the United States during the year ended March 31, 2015 increased $107.7 million, or 16.1%, compared to the same period in 2014, *primarily due to price adjustments during the year and increased market share of select products*.
>
> **YEAR ENDED MARCH 31, 2014 COMPARED WITH YEAR ENDED MARCH 31, 2013**
>
> Sales. For the year ended March 31, 2014, sales increased $88.3 million, or 13.2%, compared to the same period in 2013. Sales in the United States during the year ended March 31, 2014 increased $81.6 million, or 13.9%, compared to the same period in 2013, *primarily due to price adjustments and increased market share of select products*.

327. The italicized statements were materially false and misleading for the reasons given in 315.

328. The 20-F also stated, with reference to both fiscal years 2014 and 2015 that "[i]n general, as competition on any specific product increases, our pricing may not be sustainable and sales volumes may decline."

329. This statement was materially false and misleading because Taro's collusion ensured that its fixed prices would be sustainable.

330. On May 27, 2016, Taro held its Q4 conference call. During that call, Subramanian falsely claimed that "competitive intensity" was not "in [Taro's] hands":

> **David Maris** - Wells Fargo Securities – Analyst
>
> Actually my question on margins was answered, but just to be clear, you mentioned that maybe you could just talk about the sustainability of that. Not so much quarter to quarter; this was a high quarter, the next quarter lower. But just in

> general, relative to other generic companies, your margins are much higher and they have been for a while, so can you just talk about the sustainability of that and the business model scalability?
>
> Then separately, the question on the balance sheet and use of cash, is there any thought on just returning a lot of that cash to shareholders relative to keeping a lot of dry powder to do deals?
>
> **Kal Subramanian** - Taro Pharmaceutical Industries Ltd. - CEO
>
> Okay. I'll take your question in twofold. The first one relates to what is the sustainability of margins; *largely depends on competitive intensity which is not in our hands*. My own tolerability is that this being a specialty business and the products require complex formulation, clinical development, so to a degree that by itself has an ability to limit competition. But within that, how many competitors will come for which product when, difficult to predict.

331. The italicized statement was materially misleading because Taro had taken "competitive intensity" into its "hands" by colluding on prices for the Drugs.

332. On June 9, 2016, Taro filed its 2015 annual report on Form 20-F, which was signed by Kalb. That report provided:

> **Competition and Pricing**
>
> *The pharmaceutical industry is intensely competitive. We compete with the original manufacturers of the brand-name equivalents of our generic products, other generic drug manufacturers (including brand-name companies that also manufacture generic drugs or license their products to other generic drug manufacturers) and manufacturers of new drugs that may compete with our generic drugs*. Many of our competitors have greater financial, production and research and development resources, substantially larger sales and marketing organizations, and substantially greater name recognition than we have….
>
> *In the United States, we compete with branded pharmaceutical manufacturers such as* Bristol-Myers Squibb Company, GlaxoSmithKline Inc., Merck & Co., Inc., Novartis AG, Pfizer Inc., Valeant Pharmaceuticals International, Inc. and Galderma Laboratories, LP., as well as with generic companies such as *Teva Pharmaceuticals U.S.A., Mylan Inc., Perrigo Company PLC, Glenmark Generics, Inc., USA. and Sandoz Pharmaceuticals (the generics subsidiary of Novartis).* Many of these companies have more resources, market and name recognition and better access to customers than we have. Therefore, there can be no assurance that we can compete successfully with them.

333. The italicized statements were materially misleading for the reasons given in 311 and 313.

334. On August 10, 2016, Taro filed a press release on Form 6-K, which was signed by Subramanian. In that release, Subramanian stated that "[s]ales from new products are beginning to accelerate, however we continue to experience *increased competitive intensity*."

335. This statement was materially misleading for the reasons given in 311.

**G. Defendants' Misstatements and Omissions Relating to Taro's Sales Figures**

336. As alleged herein, throughout the Class Period, Defendants were engaged in illegal price fixing activity with respect to the Drugs. Defendants' failure to disclose these issues rendered Taro's Class Period financial statements materially misstated because Taro failed to make required disclosures regarding the impact of artificial price increases (tied to illegal price-fixing activity) on its reported revenue, in violation of SEC disclosure.

337. On July 3, 2014, Taro filed its annual report on Form 20-F. The document reported net sales revenues of $669.4 million, $587.5 million, and $122.4 million for fiscal 2014, 2013 and 2012, respectively.

338. On August 8, 2014, Taro filed a Form 6-K containing Taro's 2Q14 results, which was signed by Subramanian. Taro reported net sales of $130.2 million for the 2Q14.

339. On November 10, 2014, Taro filed a Form 6-K containing Taro's 3Q14 results, which was signed by Subramanian. Taro reported net sales of $250.8 million, $205.3 million, $381 million, and $358.5 million for the second quarter and first six months of 2013, as well as the second quarter and six months of 2014, respectively.

340. On February 10, 2015, Taro filed a Form 6-K signed by Subramanian. The document reported net sales for Taro of $237.7 million and $618.7 million for the quarter and nine months ended December 31, 2014.

341. On May 27, 2015, Taro filed a Form 6-K, which was signed by Subramanian. The document contained Taro's net sales for the quarters and years ending March 31, 2015 and March 31, 2014. Taro reported the figures for those periods as $244.1 million, $862.9 million, $187.1 million, and $759.2 million.

342. On July 1, 2015, Taro filed its annual report on Form 20-F. That document reported the following U.S. net sales of $77.1 million in 2015, $669.4 million in 2014, and $587.8 million in 2013. These U.S. net sales comprised 90%, 88%, and 88% of Taro's sales, respectively.

343. On August 6, 2015, Taro filed a Form 6-K with the SEC, which was signed by Subramanian. The document reported net sales of $215 million for the quarter ended June 30, 2015, reflecting an increase of $85 million.

344. On November 4, 2015, Taro filed a Form 6-K signed by Subramanian. That document reported net sales of $212 million, $427.3 million, $250.8 million, and $381 million for the quarter and six months ended September 30, 2015 and 2014, respectively.

345. On May 27, 2016, Taro filed a Form 6-K signed by Subramanian. That document reported net sales for the quarters and years ended March 31, 2016 and March 31, 2015 of $265 million, $950.7 million, $244.1 million, and $862.9 million.

346. On June 9, 2016, Taro filed its Annual Report on Form 20-F, which was signed by Kalb. That report stated:

> Sales and Marketing
>
> In the United States, Israel and Canada, our sales are primarily generated by our own dedicated sales force. In other countries, we sell through agents and other distributors. Our sales force is supported by our customer service and marketing employees.

The following is a breakdown of our net sales by geographic region, including the percentage of our total consolidated net sales for each period:

| | Year ended March 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2016 | | 2015 | | 2014 | |
| | Sales (in thousands) | % of total sales | Sales (in thousands) | % of total sales | Sales (in thousands) | % of total sales |
| United States | $ 865,224 | 91% | $ 777,191 | 90% | $ 669,481 | 88% |
| Canada | 56,605 | 6% | 55,452 | 6% | 56,718 | 7% |
| Israel | 22,963 | 2% | 22,157 | 3% | 22,917 | 4% |
| Other | 5,959 | 1% | 8,144 | 1% | 10,169 | 1% |
| Total | $ 950,751 | 100% | $ 862,944 | 100% | $ 759,285 | 100% |

## H. Taro Failed to Disclose the Impact of Illegal Price-Fixing Activity on Reported Revenues

347. As alleged herein, during the Class Period, Taro was engaged in illegal price-fixing activity on the Drugs. SEC MD&A disclosure rules required defendants to disclose the impact of the Drugs' price increases on Taro's reported revenues, including the origin of the price increases (*i.e.*, illegal price-fixing activity), on Taro's reported revenues during the Class Period.

348. The SEC explicitly requires disclosures detailing changes in price that impact reported revenues. Item 303 of Reg S-K states:

> To the extent that the financial statements disclose material increases in net sales or ***revenues, provide a narrative discussion of the extent to which such increases are attributable to increases in prices*** or to increases in the volume or amount of goods or services being sold or to the introduction of new products or services . . . ***discuss the impact of*** . . . ***changing prices on the registrant's net sales and revenues*** and on income from continuing operations. 17 C.F.R. § 229.303(a)(3)(iii) and (iv).

> SEC Staff Accounting Bulletin No. 104 ("SAB 104") required additional MD&A disclosures regarding the impact of the Drugs' price increases. SEC Financial Reporting Release No. 72, *Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations* states:We believe that management's most important responsibilities include communicating with investors in a clear and straightforward manner. MD&A is a critical component of that communication. The Commission has long sought through its rules, enforcement actions and interpretive processes to elicit MD&A

> that not only meets technical disclosure requirements but generally is informative and transparent. . . .The purpose of MD&A is not complicated. It is to provide readers information "necessary to an understanding of [a company's] financial condition, changes in financial condition and results of operations." The MD&A requirements are intended to satisfy three principal objectives:
>
> - to provide a narrative explanation of a company's financial statements that enables investors to see the company through the eyes of management;
>
> - to enhance the overall financial disclosure and provide the context within which financial information should be analyzed; and
>
> - to provide information about the quality of, and potential variability of, a company's earnings and cash flow, so that investors can ascertain the likelihood that past performance is indicative of future performance.

349. SAB 104 also states:

> ***Changes in revenue*** should not be evaluated solely in terms of volume and price changes, but ***should also include an analysis of the reasons and factors contributing to the increase or decrease***.

350. Likewise, SEC Release No. 33-8350 provides the following analogous disclosure guidance requiring an analysis of volume ***and price changes*** affecting the Company's revenues:

> For example, if a company's financial statements reflect materially lower revenues resulting from a decline in the volume of products sold when compared to a prior period, MD&A should not only identify the decline in sales volume, but also should ***analyze the reasons underlying the decline in sales when the reasons are also material and determinable***. The analysis should reveal underlying material causes of the matters described, including for example, if applicable, difficulties in the manufacturing process, a decline in the quality of a product, loss in ***competitive position and market share***, or a combination of conditions.

351. As alleged herein, Taro's reported revenues were significantly impacted by illegal price-fixing activity on the Drugs.

352. As set forth herein, Defendants also materially increased generic revenues by artificially hiking the prices of the Drugs, as a result of illegal price-fixing activity, beginning in 2013. Defendants' failure to disclose the true cause of the artificial price increases on the Drugs on its reported revenues was in clear violation of the SEC disclosure rules described above. By

failing to make the required SEC disclosures regarding price increases, Defendants were able to conceal the impact of illegal price-fixing activity on the Company's future performance. The SEC has explicitly stated that "[o]ne of the principal objectives of MD&A is to provide information about the quality and potential variability of a company's earnings and cash flow, so that ***readers can ascertain the likelihood that past performance is indicative of future performance***."

353. Likewise, SAB 104 states:

> The Commission stated in FRR 36 that MD&A should "give investors an opportunity to look at the registrant through the eyes of management by providing a historical and ***prospective analysis*** of the registrant's financial condition and results of operations, ***with a particular emphasis on the registrant's prospects for the future***."

354. As alleged herein, the illegal price-fixing activity: (1) was not a sustainable business practice, and (2) subjected the Company to material legal, regulatory, and financial risks. Both of these factors had material consequences on the Company's future performance. As such, Defendants were required to disclose the true cause of the Drugs' price increases, tied to illegal price-fixing activity, so that investors could "ascertain the likelihood that past performance was indicative of future performance." By failing to do so, Taro's Class Period financial statements were materially misstated and in violation of SEC disclosure rules.

**I. Taro Discloses that the DOJ is Investigating the Company**

355. On September 9, 2016, Taro disclosed in an SEC filing that "Taro Pharmaceuticals, U.S.A., Inc. . . . as well as two senior officers in its commercial team, received grand jury subpoenas from the United States Department of Justice, Antitrust Division, seeking documents relating to corporate and employee records, generic pharmaceutical products and pricing, communications with competitors and others regarding the sale of generic pharmaceutical products, and certain other related matters."

356. After this disclosure, Taro stock fell from a September 9, 2016 closing price of $123.46 to a September 12, 2016 closing price $119.36, a decline of over 3%.

357. A September 21, 2016 analyst report on Taro parent Sun Pharmaceuticals by Dr. Harith Ahamed and Krishna Kiran Konduri of Spark Capital noted how critical Clobetasol price increases had been for the Company's success:

> **Significant price increases across Taro's portfolio:** Price increases across its derma portfolio has been a key driver for Taros strong performance in recent years. For instance, clobetasol propionate, Taro's top product, accounting for [approximately] 11% of sales in FY16, has witnessed price increases of >12x between 2013 and 2015. Sustainability of Taro's price increase-driven performance has been a key concern for investors of [Sun]."

358. The report further discussed why the DOJ subpoena threatened the "sustainability" of Taro's rice hikes:

> **Recent DOJ subpoena adds to Taros pricing concerns:** We observe negative yoy [year-over-year] and sequential pricing trends for Taro's key derma products. The recent subpoena from US DoJ Antitrust Division to Taro seeking details related to drug pricing has added to our concerns on sustainability of Taro's price increases. We believe the heightened scrutiny will make it difficult for Taro to implement further price hikes. Taro's significantly superior margins (vs. generic peers) are unlikely to sustain in a tougher generic derma pricing environment.

## J. The Truth is Revealed

359. On November 3, 2016, *Bloomberg* published an article by David McLaughlin and Caroline Chen entitled "U.S. Charges in Generic-Drug Probe to Be Filed by Year-End."[25] The article's disclosure that the first criminal charges would likely be filed by the end of the year heightened the market's concerns that certain generic drug companies, including Taro – which was specifically mentioned in the article – had been fixing prices:

> Prosecutors said to ask if executives agreed to raise prices
>
> Antitrust investigation spans two dozen drugs, dozen companies

[25] *See* https://www.bloomberg.com/news/articles/2016-11-03/u-s-charges-in-generic-drug-probe-said-to-be-filed-by-year-end.

U.S. prosecutors are bearing down on generic pharmaceutical companies in a sweeping criminal investigation into suspected price collusion, a fresh challenge for an industry that's already reeling from public outrage over the spiraling costs of some medicines.

The antitrust investigation by the Justice Department, begun about two years ago, now spans more than a dozen companies and about two dozen drugs, according to people familiar with the matter. The grand jury probe is examining whether some executives agreed with one another to raise prices, and the first charges could emerge by the end of the year, they said.

Though individual companies have made various disclosures about the inquiry, they have identified only a handful of drugs under scrutiny, including a heart treatment and an antibiotic. Among the drugmakers to have received subpoenas are industry giants Mylan NV and Teva Pharmaceutical Industries Ltd. Other companies include Actavis, which Teva bought from Allergan Plc in August, Lannett Co., Impax Laboratories Inc., Covis Pharma Holdings Sarl, Sun Pharmaceutical Industries Ltd., Mayne Pharma Group Ltd., Endo International Plc's subsidiary Par Pharmaceutical Holdings and Taro Pharmaceutical Industries Ltd. …

Allergan, Impax and Sun declined to comment beyond their filings. Representatives of Endo, Covis, Taro and Lannett didn't respond to requests for comment….

Harsh Criticism

Charges could extend to high-level executives, according to the people. The antitrust division, which has an immunity program to motivate wrongdoers to confess and inform on others, has stepped up its commitment to holding individuals responsible….

Generic drug companies are also contending with a civil price-fixing investigation by Connecticut Attorney General George Jepsen. Jepsen is seeking to lead a group of states to probe the industry, which could result in cases seeking damages, according to people familiar with the matter. A spokesman for the Connecticut Attorney General's office declined to comment.

The first subpoenas in the generics investigation were issued by Connecticut in July 2014, while the Justice Department followed in November, according to regulatory filings by the companies. The investigations initially focused on mid-sized U.S. companies and have since extended to the biggest manufacturers and U.S. subsidiaries of overseas companies.

Industry Consolidating

Generic drugs account for 88 percent of prescriptions dispensed in the U.S., according to the Generic Pharmaceutical Association. Generics makers brought in

> about $70 billion in U.S. sales in 2015, after discounts and rebates to payers, according to Bloomberg Intelligence. The industry has been consolidating over the past few years, led by Teva's $40.5 billion purchase of Actavis. That's given the biggest generics manufacturers more pricing power, while companies with smaller portfolios have less….

360. The market devalued Taro as a result of this revelation and Taro stock fell to a November 3, 2016 closing price of $93.68 from a November 2, 2016 closing price of $101.05, a decline of over 7%.

**POST-CLASS PERIOD EVENTS**

361. On May 2, 2017, Perrigo – who Taro colluded with to fix prices on two of the five Drugs (Desonide and Econozale) – disclosed that search warrants had been executed at its corporate offices with regards to the ongoing DOJ investigation of price fixing.[26]

**ADDITIONAL SCIENTER/FALSITY ALLEGATIONS**

362. As alleged herein, Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of the Company or in their own name during the Class Period were materially false and misleading.

363. Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding price fixing of the Drugs, their control over, and/or receipt and/or modification of Taro's allegedly materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

---

[26] See *Perrigo Discloses Investigation*, PR Newswire (May 2, 2017), http://www.prnewswire.com/news-releases/perrigo-discloses-investigation-300450244.html.

364. Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information that they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

365. The Individual Defendants, because of their positions with Taro, made and/or controlled the contents of the Company's public statements during the Class Period. Each Defendant was provided with or had access to the information alleged herein to be false and/or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, these Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were materially false and misleading. As a result, each of these Defendants is responsible for the accuracy of Taro's corporate statements and are therefore responsible and liable for the representations contained therein.

### A. Defendant Kalb Attended Biweekly Meetings Relating to Pricing During the Class Period

366. As related by CW2, every other Monday, Defendant Kalb attended meetings relating to pricing with Taro managers, executives, and employees. Pricing of the Drugs is at the center of Defendants' fraud.

### B. The Fraud Infected Taro's Core Operations, which Defendants and Analysts Closely Monitored

367. Defendants regularly acknowledged that Taro's viability as a competitor in the generic drug market depended heavily on industry competition and pricing. That is why Taro's generic pricing was one of the first topics Taro addressed in virtually all of the earnings

conference calls throughout the Class Period. Subramanian and Kalb were present on each of these conference calls and repeatedly spoke about pricing issues and what drove net sales and earnings increases.

368. Throughout the Class Period, the Individual Defendants themselves confirmed their personal involvement and awareness of the details concerning the topics central to their scheme to defraud: pricing of generic drugs, including the Drugs.

369. Defendant Subramanian repeatedly engaged in lengthy colloquies with analysts about competition and pricing, demonstrating that he was well aware of such issues. *See* ¶¶314-322.

370. For example, during a November 10, 2014 conference call, Subramanian demonstrated he had intimate knowledge of how Taro's Drugs were affected by the competitors:

> Ebjeck Sharma - IIFC – Analyst
>
> Yes. Just some color on competitive intensity within the derma generics space as it is building up would be helpful. Is the competition coming from within the existing peers as they expand their ANDA portfolio? Or do you see new competitors on the horizon? Is it product-specific, or is it all across the board?
>
> Kal Subramanian - Taro Pharmaceutical Industries Ltd. - CEO
>
> Remember, in the beginning we said that we are not going to share commercially sensitive information.

371. That same day, November 10, 2014, analysts Aggarwal and Shah wrote a report on Taro. That report specifically discussed price increases in two of the Drugs, Clobetasol and Fluocinonide:

> Taro reported a strong quarter with sales now annualizing to $1 bn and EBITDA margin of 66%. Sequentially, volumes for Taro remained the same and the increase was driven by price increases taken in drugs such as Clobetasol, Fluocinonide, Warfarin, etc. in Jun-2014…

372. On May 5, 2015, analysts Aggarwal and Shah issued another Taro report. That report stated that "PriceRx and IMS both confirm that Taro has pushed through price increase in a couple of products [including] Econozale nitrate cream (antifungal medication)."

373. During a May 28, 2015 conference call, Shangvi further confirmed he was aware of how Taro priced the Drugs, with specific reference to Clobetasol:

> Chunky Shah – Credit Suisse – Analyst. This is Chunky [Shah] from Credit Suisse. I had a question on Clobetasol. I know that you are not ultra specific but this is a large product for us. And we find it really surprising that in a [three year] market, market share has been declining. So if you are a market leader you are back around [50%] market share. And now we are left with 20%. So, the reason here is that is there a differentiating power pricing with this competitor? Or is there anything else which we are missing?
>
> Dilip Shanghvi - Taro Pharmaceutical Industries Ltd. – Chairman. I told you in the last earnings call also for what do you say competitive confidential reasons I prefer not to answer product-specific questions on this call. Hope you don't mind.

374. On June 10, 2016, Credit Suisse issued a report on Taro emphasizing revenues from Clobetasol. That report stated that "FY16 US sales increased in four products. Clobetasol, largest now ($102 mn sales or 10.7%)…."

375. Subramanian also discussed his knowledge of the generics market with analysts on other conference calls. *See* ¶¶ 314, 316, 318, 320, 322, 330.

376. Defendant Kalb was present on these conference calls.

377. These discussions demonstrate that the Individual Defendants acted knowingly by fixing, or allowing the fixing of, prices on the Drugs.

**C. Trade Association Meetings Occurred Just Prior to Taro's Price Hikes**

378. The chart at Exhibit A demonstrates that the various trade associations at which Taro colluded occurred right before Taro hiked prices – in a coordinated manner and steeply – on the Drugs. *See id*. (describing when and where the meetings occurred, what companies and, when known, what individuals attended, and what drugs were colluded on).

### D. Taro's Stock Price Increased After the Company Raised Clobetasol Prices

379. Before the Class Period, Taro's Clobetasol prices were remarkably stable. In the five preceding months, the standard deviation for its 15 mg, 30 mg. and 60 mg. sizes of Clobetasol 0.05% emollient cream products were no more than 3% of the average prices of its products during the same period. After this period of relative stability, Taro increased its effective prices, beginning in June 2014. Between May 2014 and June 2014, for its three dosage formulations, Taro raised its effective prices by 177% to 306%.

380. After these exponential price hikes, Taro's stock price rose dramatically. On June 26, 2014, Taro stock closed at $118.28 per share. On June 27, 2014, Taro stock closed at $137.97 per share. Taro stock continued to rise steadily to a closing price of $149.31 on July 14, 2014.

381. Indeed, analysts were well aware of the importance of competition in the generic drug industry. For example, on August 6, 2014, Credit Suisse analysts Anubhay Aggarwal and Chunky Shah wrote a report discussing the effect of competition on Taro. The report stated:

> We highlighted significant price increases by Taro in eleven products in June. Key to sustainability of these price increases was the competitor response. **Our checks on these products suggest that competition has matched Taro's price increases.** In our view, competition benefits more from price increases than volumes, and thus we expected competition to follow.

382. These analysts also noted that "[t]he largest benefit to Taro is from Clobetasol where Sandoz and Hi-Tech have matched Taro's prices" and that "[t]he same has been the case in Fluocinonide."

**E. Taro's Revenues Skyrocketed by 47% Due to Collusion**

383. Taro has reaped enormous profits by fixing prices on the Drugs. In total, Taro has earned, less rebates, approximately $1.54 billion in collusive revenues[27] from its price fixing:

| Drug | WAC (Wholesale Acquisition Cost less discounts) ($m) | WAC (less discounts & rebates) ($m) |
|---|---|---|
| Acetazolamide | 63 | 49 |
| Clobetasol | 956 | 735 |
| Clomipramine | 262 | 202 |
| Desonide | 203 | 156 |
| Econazole | 118 | 91 |
| Enalapril | 123 | 95 |
| Fluocinonide | 276 | 212 |
| Total | 2,001 | 1,540 |
| | | |

384. Taro's revenue from mid-2013 through 2016 was $3.244 billion and collusive revenue from the Drugs totaled $1.54 billion. Accordingly, Taro's collusive revenues from price fixing the Drugs amounted to over 47% of its revenues.

385. Clobetasol alone accounted for almost half of the collusive revenues – or approximately 23% of the increased revenues.

---

[27] Collusive revenues are revenues earned on the Drugs, less what would have been earned but for collusion, taking into account rebates, as Taro reports their revenues net of rebates. Taro stated in its 2016 Form 20-F that "[w]hen we recognize and record revenue from the sale of our pharmaceutical products, we record an estimate in the same financial reporting period for product returns, chargebacks, rebates and other sales deductions, which are reflected as reductions of the related gross revenue." *Id*. at 38. Rebates need to be factored in to determine a true "net sales" number because Taro's revenues will be reduced by the amount in rebates it pays out. Rebates are non-transparent and are not reported on an individual drug level. Plaintiff's expert used a proxy of 23.1% for rebates, based off the Medicaid Drug Rebate Program. Plaintiff's expert calculated the collusive revenue post-rebate by taking the collusive revenues for each drug and subtracting 23.1%.

## F. Taro's Ethics Code Required the Company to Monitor Collusive Behavior

386. Taro's Ethics Code provides as follows:

Dear Colleagues,

As a Company, we are all expected to act ethically and comply with all applicable laws and regulations that govern our business. This Code of Conduct—together with our Compliance Policies—will help us achieve that goal. Our Code is designed to educate all Taro employees as well as our external stakeholders about our standards of conduct. It also explains and reaffirms our commitment to fair and honest dealing, creating safe and high quality products, and maintaining reliable financial records and accounts.

Everyone at Taro is expected to cooperate with Company requests or instructions regarding the Code of Conduct and Compliance Policies, including participation in training. You should always feel free to come forward with questions or concerns about our Code or policies. Remember that you will never face retaliation for asking a question, reporting potential misconduct in good faith, or participating in an investigation.

Taro will continue to maintain the highest standards of quality, safety, and excellence for our products around the world, while also acting responsibly and with integrity. In turn, you are responsible for upholding and maintaining Taro's good name, and only engaging in conduct that preserves the trust of our customers and ensures our continued lawful business operation.

* * *

FAIR COMPETITION AND ANTITRUST LAWS

We believe in competing vigorously, but always fairly. Taro's products and processes succeed based on quality, not through belittling the competition or breaking the rules. This means we do not disparage or make untrue statements about our competitors' products or services. Instead, we stress the advantages that Taro offers, making only fair and accurate comparisons between our offerings and those of our competitors. Because we value accountability, we concentrate on anticipating and satisfying our customers' needs, and we will not seek to limit the competitive opportunities of our rivals in deceitful or fraudulent ways.

Competing fairly also means we are accountable for following the various competition and antitrust laws in place in the countries where we do business. These laws exist to ensure that consumers can get the best value on the products and services they purchase. Competition laws are complex, and most of us are not expected to know all of their details. All of us are, however, expected to know and adhere to the rules at Taro. As a Company, we must make independent business decisions, not in concert with other companies.

This means we do not discuss any of the following topics with our competitors:

- Prices or price-fixing
- Customer or market allocation
- Bids or bid-rigging
- Any topic that seems to be about restricting competition

If a competitor attempts to engage you in a discussion on any of these topics, make it clear that you do not wish to participate.

Leave the conversation immediately, and report the matter to Corporate Compliance. Under competition laws, even

the appearance of wrongdoing can cause trouble for our Company. If you have any questions about whether a discussion or

activity is acceptable, bring your concerns up with the Legal Department.

http://www.taro.com/media/oMedia/TaroCOC.pdf.

387. Defendants' violations of Taro's code demonstrates that they acted knowingly.

## G. CEO Subramanian and CFO Kalb's Resignations Are Highly Suspicious

388. Less than two months before Taro announced that it had received a subpoena from the DOJ, on June 21, 2016, Taro announced that its CFO, Kalb, was resigning.

389. Just two weeks later, in the July 6, 2016 6-K, Taro announced that its CEO, Subramanian, was also resigning. Taro announced that Subramanian was returning to India to serve in an executive position at Taro parent Sun Pharmaceuticals.

390. Sun, Taro's parent, received a DOJ subpoena in May 2016.[28] Sun and Taro have several principals who have moved between the two companies, including Defendant Subramanian, former Taro Interim CEO Kedrowski, and current Taro CEO Dilip Shangvi.

---

[28] *India's Sun Pharma Gets U.S. Subpoena Over Generic Drugs Pricing*, Reuters (May 28, 2016), http://fortune.com/2016/05/28/sun-pharma-drug-price-subpoena.

391. The resignation of Taro's CEO and CFO within two weeks of one another, one month after its parent company received a DOJ subpoena, and two months before Taro received a DOJ subpoena.

**H. The Individual Defendants Were Motivated to Commit Fraud to Increase Their Bonuses and Discretionary Earnings**

392. The Individual Defendants earned extra income by participating in the fraud alleged herein.

393. Taro's August 13, 2013 Form 6-K provides as follows:

> 2.4.2 The Compensation Policy is intended to apply to the Office holders serving in the Company at the date of its entry into force and all Office holders that will commence their service with the Company while the Policy is in effect, including:
>
> - The CEO of the Company (hereinafter: " CEO ").
> - Senior staff: CFO & Chief Accounting Office holder(s), General Counsel & VP Corporate Compliance, GVP R&D, GVP Quality Affairs, GVP Haifa Site Manager, GVP Portfolio Manager, GVP & General Manager Canada, VP HR, Head of Procurement, CCO of the Generic Rx Business U.S., VP S&M TPHA, VP IT Israel, and any other Office holder, as shall be defined by the Board of Directors.
>
> 3.2.3 Examples of Bonus plan performance targets that will be considered, among others:
>
> - Accomplishment of Key Performance Objectives
> - Financial results
> - Sales objectives
> - R&D objectives
> - Cost savings
> - Meeting the Company's budget
> - Shareholder value

394. The following chart lists the compensation awarded to the Individual Defendants during the Class Period:

| Name | Base Compensation | Benefits and Perquisites | Variable Compensation | Equity-Based Compensation | Total ($) |
|---|---|---|---|---|---|
| Subramanian (2016) | 400,000 | 34,767 | 400,000 | -- | 834,767 |
| Subramanian (2015) | 400,000 | 40,075 | 400,000 | -- | 840,075 |
| Kalb (2015) | 344,754 | 51,530 | 103,426 | -- | 499,710 |

395. Subramanian and Kalb received over $1 million in additional compensation in 2015 and 2016 combined, a material part of which was as a result of Taro's net sales and revenue growth.

396. Accordingly, these defendants were motivated to fix prices on the Drugs and make material misrepresentations and omissions to the market to reap such extra monies.

## I. Defendants Signed Sarbanes-Oxley Certifications Attesting that They Personally Supervised Taro's Controls and Procedures

397. Throughout the Class Period, Defendants Subramanian and Kalb repeatedly certified that they personally supervised and participated in the evaluation of Taro's financial controls and procedure, and that the Company's financial disclosures fairly and accurately presented its financial condition. Further, in each 10-Q and 10-K report, Taro states that "[t]he Company's chief operating decision maker evaluates the financial performance of the Company's segments based upon segment income (loss) before income taxes." Moreover, Taro's many misleading 6-K and 20-F reports were always followed by earnings calls during which all of the Individual Defendants described the favorable, but inaccurate, financial results (several examples of such calls are set forth above).

## LOSS CAUSATION / ECONOMIC LOSS

398. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Taro securities and operated as a fraud or deceit on Class Period purchasers of Taro securities by failing to disclose and misrepresenting the adverse facts detailed herein. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Taro securities fell as the prior artificial inflation came out.

399. As a result of their purchases of Taro securities during the Class Period, Lead Plaintiff and the other Class members suffered economic loss, i.e., damages, under the federal securities laws. Defendants' false and misleading statements had the intended effect and caused Taro securities to trade at artificially inflated levels throughout the Class Period.

400. By failing to disclose to investors the adverse facts detailed herein, Defendants presented a misleading picture of Taro's business, competition, the causes of the Company's success, and the causes and underlying dynamics of its net sales and earnings growth. When the truth about the Company was revealed to the market, the price of Taro securities declined. These declines removed the inflation from the price of Taro securities, causing real economic loss to investors who had purchased Taro securities during the Class Period.

401. The declines in the price of Taro securities after the corrective disclosures on September 9, 2016 and November 3, 2016 were a direct result of Defendants' fraudulent misrepresentations being revealed to investors and the market.

402. The declines in the price of Taro securities were also the result of the materialization of the concealed investment risk that Taro's price fixing would become public.

403. Defendants' materially false and misleading statements relate to the competition Taro faced and the causes of Taro's net sales and earnings growth.

404. The first corrective disclosure in September 2016 revealed part of the truth about Taro. By revealing that the DOJ had served Taro and two senior officers in its commercial team with grand jury subpoenas seeking documents relating to, inter alia, generic pharmaceutical products and pricing and communications with competitors and others regarding the sale of generic pharmaceutical products, the market began to learn that Taro was not competing with other generic pharmaceutical companies as described, was fixing prices, and that Taro's net sales and earnings growth were caused, in part, by price fixing.

405. This disclosure also caused part of the concealed investment risk that Taro's price fixing would become public to materialize.

406. After this disclosure, Taro stock fell to a September 12, 2016 closing price of $119.36 from a September 9, 2016 closing price of $123.46, a decline of almost 4%.

407. At the end of the Class Period, the seriousness of the DOJ investigation was further revealed by a Bloomberg news article reporting that "U.S. prosecutors [were] bearing down on generic pharmaceutical companies [including Taro, which was specifically mentioned in the article] in a sweeping criminal investigation into suspected price collusion. "

408. This disclosure further revealed that Taro was not competing with other generic pharmaceutical companies as described, was fixing prices, and that Taro's net sales and earnings growth were caused, in part, by price fixing.

409. This disclosure also further caused the concealed investment risk that Taro's price fixing would become public to materialize.

410. Taro stock fell to a November 3, 2016 closing price of $93.68 from a November 2, 2016 closing price of $101.05, a decline of approximately 7%.

411. The timing and magnitude of the price declines in Taro common stock negate any inference that the loss suffered by Lead Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct. The economic loss, i.e., damages, suffered by Lead Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Taro securities and the subsequent significant decline in the value of Taro common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## CLASS ACTION ALLEGATIONS

412. This is a class action pursuant to Rules 23(a) and (b)(3) of the federal Rules of Civil Procedure on behalf of a Class of all persons who purchased Taro common stock on the open market in the United States during the Class Period, and were damaged thereby. Excluded from the Class are (1) Taro, and its officers, directors, employees, affiliates, legal representatives, predecessors, successors and assigns, and any entity in which any of them have a controlling interest or are a parent; and (b) all Defendants, their immediate families, employees, affiliates, legal representatives, heirs, predecessors, successors and assigns, and any entity in which any of them has a controlling interest.

413. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period Taro shares traded on the NYSE under the ticker symbol "TARO." While the exact number of Class members is unknown to Plaintiff at this time and can only be obtained through appropriate discovery, Plaintiff believe that there are thousands of Class members located throughout the United States. Record owners and other members of the Class may be identified from records maintained by Taro and/or its transfer agents and may

be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

414. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. The questions of law and fact common to the Class include (1) whether Defendants violated the federal securities laws, including the Exchange Act; (2) whether Defendants omitted and/or misrepresented material facts about environmental risk that were known and material; (3) whether Defendants knew or recklessly disregarded that their statements were false or misleading; (4) whether the market price of Taro common stock was artificially inflated during the Class Period due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and (5) the extent to which members of the Class have sustained damages and the proper measure of any such damages.

415. Plaintiff's claims are typical of the claims of other Class members, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law as complained of herein.

416. Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel that is competent and experienced in class and securities litigation. Plaintiff has no interest that is in conflict with, or otherwise antagonistic to the interests of the other Class members.

417. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually

redress the wrongs done to them. There will be no difficulty in management of this action as a class action.

**PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET**

418. At all relevant times, the market for Taro common stock was an efficient market for the following reasons, among others: (1) the common stock were listed and actively traded on the NYSE, a highly efficient market; (2) Taro filed periodic public reports on Form 20-F and Form 6-F with the SEC; (3) Taro regularly issued press releases that were carried by the national news wires, were publicly available and entered the public marketplace; and 4) Taro was regularly followed and reported on by analysts who issued reports to investors.

419. As a result, the market for the securities promptly digested current information regarding Taro from all publicly available sources and reflected such information in Taro's stock price.

420. Under these circumstances, all purchasers of the common stock during the Class Period suffered similar injury through their purchases of stock at artificially inflated prices and a presumption of reliance applies.

**COUNT I**

**Violations of Section 10(b) of the Exchange Act**
**and Rule 10b-5 Promulgated Thereunder**

421. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

422. During the Class Period, Taro carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Taro securities at artificially inflated prices. In furtherance of

this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

423. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Taro securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

424. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Taro's illegal anti-competitive activities, as specified herein.

425. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Taro and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

426. Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's periodic disclosures to investors; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's compliance with environmental regulations at all relevant times; and (iv) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

427. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Taro's anti-competitive activities from the investing public and supporting the artificially inflated price of its securities. As demonstrated by the allegations above, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

428. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of the securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by these Defendants, or upon the integrity of the market in which the securities trade, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by these defendants during the Class Period, Plaintiff and the other members of the Class acquired the securities during the Class Period at artificially high prices and incurred damages.

429. At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding Taro, which was not disclosed by these Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired the securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

430. By virtue of the foregoing, these Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

431. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the securities during the Class Period.

**COUNT II**

**Violation of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

432. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

433. The Individual Defendants acted as controlling persons of Taro within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contend are false and misleading. These Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

434. In addition, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

435. As set forth above, the Individual Defendants each violated Section 10(b) and Rule l0b-5 by their acts and/or omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff

and other members of the Class suffered damages in connection with their purchases of the common stock during the Class Period.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment as follows:

A. Determining that this action is a proper class action and certifying Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Awarding such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: New York, New York
June 15, 2017

**BERNSTEIN LIEBHARD LLP**

/s/ Michael S. Bigin

Stanley D. Bernstein (bernstein@bernlieb.com)
Michael S. Bigin (bigin@bernlieb.com)
Joseph R. Seidman, Jr. (seidman@bernlieb.com)
10 East 40th Street
New York, New York 10016
Tel: (212) 779-1414
Fax: (212) 779-3218

**Lead Counsel for Lead Plaintiff and the Proposed Class**

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the attached Amended Class Action Complaint was served on June 15, 2017 via the district CM/ECF system on all counsel of record.

*/s/ Joseph R. Seidman, Jr.*
JOSEPH R. SEIDMAN, JR.