**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| |
|---|
| **SPEAKES ET AL.,** |
| **Plaintiff,** |
| **-against-** |
| **TARO PHARMACEUTICAL INDUSTRIES, LTD. ET AL.,** |
| **Defendant.** |

16-cv-08318 (ALC)

**OPINION AND ORDER**

**ANDREW L. CARTER, JR., United States District Judge:**

Lead Plaintiff City of Atlanta Firefighters' Pension Fund ("Plaintiff" or "Atlanta Firefighters" or "Lead Plaintiff") brings this putative class action on behalf of all those who purchased the securities of Defendant Taro Pharmaceutical Industries, Ltd. ("Taro") between July 2, 2014 and November 3, 2016, against Taro and two of its former executives. Plaintiffs allege violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, arising out of Taro's entering into a number of anticompetitive agreements with its competitors to inflate the prices of various drugs. Defendants move to dismiss the Amended Complaint in its entirety pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons that follow, the Court denies Defendants' motion to dismiss in significant part.

## BACKGROUND

### I. Factual Background

The following facts are taken from the allegations contained in the Amended Complaint, which are presumed to be true for purposes of this motion to dismiss. ECF No. 34 (Corrected Amended Class Action Complaint ("Am. Compl.")). The Court also takes judicial notice of certain SEC filings, reports and public statements, many of which are referred to in the Amended Complaint. *ATSI Comm'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

Taro produces and markets pharmaceutical products and is publicly traded on the New York Stock Exchange. Am. Compl. ¶¶ 3, 413, 418. Generic, dermatological drugs are among Taro's principal product lines. *Id.* ¶ 3. Defendant Kalyanasundaram Subramanian (a.k.a. Kal Sundaram) ("Sundaram") was Taro's Chief Executive Officer until December 2016. *Id.* ¶ 26. Taro announced on July 6, 2016 that Sundaram would be stepping down to return to India to work for Taro's parent company. *Id.* ¶¶ 27, 30, 389. Defendant Michael Kalb served as Taro's Chief Financial Officer. *Id.* ¶ 28. On June 21, 2016, Taro announced that Kalb would be resigning to accept a position at another company. *Id.* ¶ 388.

Pharmaceuticals are "heavily regulated by the FDA." *Id.* ¶ 208. Generic drugs are "pharmaceutically equivalent" to brand-name drugs previously approved by the FDA, and are typically introduced after the patent expiration of a brand-name drug. *Id.* ¶¶ 59-60. Before introducing a generic drug into the market, a company must obtain FDA approval and "conduct costly and time-consuming testing to establish that its product is bioequivalent to the branded product." *Id.* ¶ 208.

Generic drugs are "commodity-like products . . . whose only distinguishing factor for purchasers [is] price." *Id.* ¶ 9. As such, if a generic manufacturer prices its products above marginal cost, others "can offer . . . the product at a lower price and take market share . . . ." *See id.* ¶¶ 65, 204. However, manufacturers may sometimes be able to increase their revenues by matching price hikes rather than by increasing their market share. *See id.* ¶ 381. In fact, analysts from Credit Suisse determined that this is precisely how Taro's competitors responded as to the conduct at issue in this case. *Id.* & Ex. 3 (Credit Suisse report on Taro, dated Aug. 6, 2014).

The generics industry has various trade associations, and Taro participates in many of them, with its employees periodically attending conferences held by these associations. *Id.* ¶¶ 238-39 &

Ex. A.  As corroborated by two confidential witnesses, at various conferences in 2013 and 2014, Taro's Chief Commercial Officer Michael Perfetto and VP of Sales and Marketing Ara Aprahamian, who both had the authority to, and did, cause pricing changes, attended meetings with conspirators (representatives from other pharmaceutical companies). *Id.* ¶¶ 7-9, 53, 82-83, 154, 199, 200, 202.  Perfetto sat on a pricing committee with Kalb. *Id.* ¶ 198.  Right after these meetings, the prices of the generics at issue in this case (the "Drugs")[1] drastically increased, with Taro's competitors increasing prices months later. *See, e.g., id.* ¶¶ 87-95, 112-14, 166-69 & Ex. A. Taro reaped over $1.5 billion in collusive revenues from this alleged price-fixing—47% of its revenues—between mid-2013 and 2016. *Id.* ¶ 11.

This conspiracy was possible because the markets for the Drugs were highly susceptible to collusion, specifically because they were dominated by only a few companies (making collusion easy), demand was highly inelastic (*i.e.*, consumers need the Drugs and are willing to pay higher prices for them), there were no reasonable substitutes for the drugs, there were high entry barriers for new companies, the Drugs' only distinguishing factor for purchasers was price, none of the Drugs had a viable substitute, and information sharing and price discovery were common. *Id.* ¶ 9.

One confidential witness ("CW1") worked in prescription sales but left Taro in March 2014. *Id.* ¶ 196.  That witness had meetings with Kalb about issues relating to pricing approvals. *Id.* ¶ 198.  The other confidential witness ("CW2") was a pricing and contracts analyst, "responsible for internal pricing, bids and contracts functionality or Taro . . . ." *Id.* ¶ 200.  That witness allegedly reported having attended bi-weekly pricing meetings that Kalb also attended. *Id.* ¶ 203.  Management instructed CW2 to change the Drug's prices. *Id.* ¶ 202.

---

[1] Seven of Taro's drugs are at issue in this case: Clobetasol, Desonide, Econozale, Fluocinonide, Clomipramine, Acetazolamide, and Enalapril. *Id.* ¶ 5.

The dramatic price changes caused industry leaders to seek congressional oversight, and members of Congress thereafter sought information from drug makers in various forms. *Id.* ¶¶ 275-77. The State of Connecticut commenced an investigation, which was followed by an investigation and litigation by the Department of Justice. *Id.* ¶ 4. This investigation is "wide-ranging[,]" and has resulted in a number of grand jury subpoenas being issued to generic drug manufacturers. *Id.* ¶ 278. On September 8, 2016, Taro and two senior officers in its commercial team received grand jury subpoenas from the DOJ seeking information as to generic pharmaceutical products and pricing. *Id.* ¶ 15. Taro publicly disclosed the receipt of subpoenas in a Form 6-K filed with the SEC the next day. *Id.* ¶ 15; *see id.* Ex. 4. Its stock price fell over $4 as a result. *Id.* ¶¶ 15-16, 356.

On November 3, 2016, *Bloomberg* disclosed that the first criminal antitrust charges would likely be filed by year-end, heightening concerns that Taro—which was mentioned in the article— had been fixing prices. *Id.* ¶¶ 355, 359, 401. Taro's stock price declined 7%. *Id.* ¶¶ 359-60.

## II. Procedural History

After the Court appointed the Atlanta Firefighters as Lead Plaintiff, Lead Plaintiff filed its Amended Complaint on behalf of a putative class of individuals who purchased Taro securities between July 2, 2014 and November 3, 2016. *See* ECF Nos. 24, 34 at ¶ 2. In the Amended Complaint, Plaintiffs assert two causes of action for violations of § 10(b), and Rule 10b-5 promulgated thereunder, and § 20(a) of the Exchange Act, principally contending that Taro did not disclose that it was allegedly engaged in price fixing. Specifically, Taro is alleged to have made misstatements as to (a) the competitiveness of the pharmaceutical industry; (b) the attribution of Taro's revenue growth to pricing adjustments; and (c) Taro's sales and revenue figures. Am. Compl. ¶¶ 310-54.

Thereafter, Taro and Kalb moved to dismiss the Amended Complaint, arguing that Plaintiffs had failed to state a cause of action under Rule 10b-5 because they did not adequately allege any actionable misstatements, scienter, or loss causation. ECF Nos. 45 (Motion), 46 ("Defs' Memo."), 47 (Declaration of Jeffrey D. Hoschander). The motion further contends that, because Plaintiffs failed to state a cause of action under § 10(b), they cannot state a claim under § 20(a). Sundaram later joined in Taro's motion. ECF No. 56. Plaintiffs oppose the motions. ECF No. 50 ("Pl's Memo."); *see* ECF No. 58 (opposition to Sundaram motion). Taro has submitted its reply brief, ECF No. 51 ("Defs' Reply"),[2] and the Court considers the motions fully submitted.

## LEGAL STANDARD

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully," and accordingly, where the plaintiff alleges facts that are "'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

In considering a motion to dismiss, the court accepts as true all factual allegations in the complaint and draws all reasonable inferences in the plaintiff's favor. *See Goldstein v. Pataki*, 516 F.3d 50, 56 (2d Cir. 2008). However, the court need not credit "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678 (citing

---

[2] The parties also submitted letters containing supplemental authorities. *See* ECF Nos. 53, 53, 59, 60.

*Twombly*, 550 U.S. at 555); *see also id.* at 681. Instead, the complaint must provide factual allegations sufficient "to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*, 507 F.3d 117, 121 (2d Cir. 2007) (citing *Twombly*, 550 U.S. at 555). In addition to the factual allegations in the complaint, the court also may consider "the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 64 (2d Cir. 2010) (citation and internal quotation marks omitted).

Where, as here, a plaintiff has alleged fraud claims under § 10(b) of the Exchange Act, the complaint is subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 (the "PSLRA"). Rule 9(b) requires that the complaint "state with particularity the circumstances constituting fraud or mistake." To satisfy the particularity requirement, a complaint must "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co.*, 375 F.3d 168, 187 (2d Cir. 2004) (citation and internal quotation marks omitted).

The PSLRA holds private securities plaintiffs to an even more stringent pleading standard. Under the PSLRA, a plaintiff must "(1) specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading; and (2) state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007) (internal citation and quotation marks omitted) (quoting 15 U.S.C. § 78u-4(b)). To determine that an inference of scienter is strong, the court must decide whether "a reasonable person would deem the inference of scienter cogent and

at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.

## DISCUSSION

### I. Section 10(b) Claim

Plaintiffs assert a securities fraud claim against Taro under § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Am. Compl. ¶¶ 421-31. To state a claim under § 10(b) and Rule 10b-5, a plaintiff must allege that the defendant "(1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." *ATSI Commc'ns*, 493 F.3d at 105. Defendants argue that Plaintiffs have failed to allege any actionable misstatements, scienter, or loss causation. For the reasons that follow, the Court denies Defendants' motion to dismiss the Amended Complaint in large part.

#### A. *Material Misstatements and Omissions*

Plaintiffs allege three categories of alleged misstatements and omissions during the relevant time period: (1) Taro's disclosures of sales and revenue figures without a corresponding disclosure of the price fixing that enabled the company's financial successes; (2) Taro's attribution of revenue growth to pricing adjustments, rather than anticompetitive conduct; and (3) the company's statements regarding the competitiveness of the generics industry (when, in fact, the atmosphere was collusive). Defendants argue that none of these are misstatements or actionable omissions. The Court substantially disagrees.

##### 1. *Competitiveness of the Industry*

Plaintiff takes issue with several statements about the competitiveness of the generics industry made by Taro and/or the individual Defendants in annual reports or other filings and during conference calls with analysts. AC ¶¶ 310-13, 318, 320, 324, 328, 330, 332, 334. These

7

statements were materially false and misleading, Plaintiff alleges, because Taro was engaged in a price-fixing conspiracy at the same time. *Id.* ¶¶ 311, 313. As to this set of statements, Defendant contends, among other things, that Plaintiff has failed to make out a price-fixing conspiracy, and that, in any event, a price-fixing conspiracy does not mean that Taro does not compete with the same companies, or otherwise render the industry non-competitive. Defs' Memo. at 15-16.

### a. Allegations of a Price-Fixing Conspiracy

The Complaint contains no direct evidence of a price-fixing conspiracy. Rather, the price-fixing allegations are premised upon parallel price movements for the drugs at issue over a short period of time, combined with certain factors that tend to indicate price-fixing.

Generally, "[d]isclosure is not a rite of confession, and companies do not have a duty to disclose uncharged, unadjudicated wrongdoing." *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014) (citations and internal quotation marks omitted). However, the failure to disclose uncharged criminal conduct may be actionable where the failure to do so would make other disclosures materially misleading. *In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 752 (S.D.N.Y. 2017) (collecting cases); *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 403 (S.D.N.Y. 2016).

Of course, a securities fraud action based upon the nondisclosure of uncharged illegal conduct must also plausibly articulate "that the underlying conduct occurred." *Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 578 (S.D.N.Y. 2016), *reconsideration denied*, No. 14-CV-3521 (JPO), 2016 WL 2642223 (S.D.N.Y. May 6, 2016). Where a complaint concerns allegations of anti-competitive conduct, mere evidence of parallel price movements does not suffice to make out a claim. *Twombly*, 550 U.S. at 553-54. Rather, "a plaintiff must show the existence of additional circumstances, often referred to as 'plus' factors, which, when viewed in

conjunction with the parallel acts, can serve to allow a fact-finder to infer a conspiracy." *United States v. Apple, Inc.*, 791 F.3d 290, 315 (2d Cir. 2015) (quoting *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 253 (2d Cir. 1987)). This may come in the form of direct or circumstantial evidence, the latter of which may include "a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications." *Id.* (quoting *Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013)).

Judge Oetken's recent decision *In re Mylan N.V. Sec. Litig.*, No. 16-CV-7926 (JPO), 2018 WL 1595985 (S.D.N.Y. Mar. 28, 2018) is illustrative. The *Mylan* court upheld a complaint alleging, among other things, Section 10(b) violations for Mylan's price-fixing arrangement with, among others, Taro, as to one of the generics precisely at issue in this case. *Id.* at \*4; *see* Am. Compl. ¶ 6.[3] As in this case, the *Mylan* Plaintiffs alleged no direct evidence of a conspiracy, but rather certain "plus factors" that demonstrate "features of the generic drug market that gave Mylan a motive to conspire to fix prices". 2018 WL 1595985, at \*16-\*17. Nearly the same factors that sufficed in *Mylan* are present here. *Compare id.*, *with* Am. Compl. ¶¶ 9, 80-85, 87, 111, 117-18, 133, 150, 151, 154-55, 166, 170, 177-81, 193, 204-274. As Plaintiffs argue (Pl's Memo. at 12 n.12), and the Court agrees, the presence of these factors elevates Plaintiffs' allegations above the mere parallel conduct found deficient in many of Defendants' proffered cases.

Defendants attempt to distinguish *Mylan* as a case where an analyst had not opined that it "made economic sense for Taro and other manufacturers to match prices increases by their competitors." Defs' Supplemental Letter, dated May 2, 2018 at 2 (ECF No. 53); *see* Defs' Memo.

---

[3] The *Mylan* court declined to resolve the parties' dispute over whether the heightened pleading requirements of the PSLRA applied to the underlying conduct, but rather concluded that Plaintiffs satisfied either standard. 2018 WL 1595985, at \*15 n.11. The Court reaches the same conclusion here.

at 11-12 n.7. However, Plaintiffs ably addressed this argument in their opposition papers, countering that the facts and expert opinion that they have proffered contradict the analyst on this point, at the least creating a fact issue worthy of discovery. Pl's Memo. at 13 & n.13 (citing *In re Platinum & Palladium Antitrust Litig.*, No. 14-cv-9391 (GHW), 2017 WL 1169626, at \*32 (S.D.N.Y. Mar. 28, 2017)).[4]

In addition, contrary to Defendants' arguments, no part of the confidential witnesses' information undermines the price fixing allegations, and their attempts to poke holes in such testimony are again improper at this stage. *See, e.g.*, *Christine Asia Co. v. Ma*, 718 F. App'x 20, 23 (2d Cir. 2017) (reversing district court's dismissal of 10(b) complaint for "failing to treat the complaint in the light most favorable to the Plaintiffs, and to draw reasonable inferences in the Plaintiffs' favor").

As such, Plaintiffs have adequately pleaded a conspiracy.

---

[4] Plaintiffs also cite to a recent decision out of the District of New Jersey, *Roofer's Pension Fund v. Papa*, No. CV 16-2805, 2018 WL 3601229 (D.N.J. July 27, 2018) ("*Perrigo*"), where the court held that the complaint supported a claim that Perrigo Company PLC colluded with Taro and others when pricing some of the drugs at issue here. *Id.* at \*3, \*11. As in *Mylan*, the *Perrigo* court relied upon the pleading of similar plus factors that adequately demonstrated the company's motive to collude. *Id.* at \*11. Defendants' attempt to distinguish *Perrigo* mirrors their arguments as to *Mylan*, and is thus unavailing. Defs' Supplemental Letter, dated Aug. 17, 2018 at 1-2 (ECF No. 60) (discussing analyst's contradictory statements). Defendants' further attempts to rely on other recent dismissals of securities fraud complaints grounded in concealment of price-fixing conspiracies are similarly unpersuasive. Defendants have furnished a transcript from *Ontario Teachers' Pension Plan Board v. Teva Pharm. Indus. Ltd.*, Civ. A. No. 3:17-cv-00558 (SRU) (D. Conn. Apr. 3, 2018), a securities fraud claim against Teva Pharmaceuticals premised upon much of the same conduct that is at issue here, and was at issue in *Mylan*. The transcript, however, reflects no definitive ruling on Defendants' motion to dismiss, but rather the *Teva* Plaintiffs' acquiescence to an amendment of their complaint. *See* Oral Argument Tr. at 54:5-20. While Judge Underhill did cast some doubt on the adequacy of the Complaint (*id.* at 51:17-19 (characterizing certain allegations as "extremely thin"), a review of the full extent of the colloquy reveals mostly a concern with the court's lack of clarity as to whether securities fraud was being alleged in the first place. *Id.* at 43-52. Judge Underhill did not formally dismiss the Complaint, nor was he clear that portions of the Complaint, as then pleaded, could not be upheld. *See Id.* at 56:25-57:3 (conveying reluctant to "rule on" Defendants' motion until complaint is amended to concisely reflect securities fraud claim); *id.* at 58:12-20 (granting leave to replead). In addition, *Mylan* was mentioned by Plaintiff's counsel only in passing, and the court made no meaningful attempt to distinguish *Mylan*. In addition, it appears that certain details lacking from the *Teva* complaint are present here. *See, e.g.*, *id.* at 22:9-23:8 (discussing lack of detail as to attendance at trade association meetings). As such, the *Teva* transcript is not persuasive. And, because the remaining cases to which Defendants cite involved completely different facts, the Court similarly affords them minimal weight.

### b. *Equating a Price-Fixing Conspiracy with Non-Competition*

Defendants' alternatively contend that the presence of a price-fixing conspiracy between certain companies does not mean those companies do not compete. This argument is unavailing.

To the extent that Taro engaged in a price-fixing conspiracy with their competitors, statements that the industry was, for example, "intensely competitive[,]" are "misleading in the absence of a disclosure of that anticompetitive conduct." *In re Mylan*, 2018 WL 1595985, at *7 (citing, *inter alia*, *In re Sotheby's Holdings, Inc.*, No. 04-CV-1041 (DLC), 2000 WL 1234601, at *4 (S.D.N.Y. Aug. 31, 2000)). Plaintiffs' reading of *Sotheby's* to require pleading that there was *no* competition, as opposed to merely that there was an anti-competitive agreement (Defs' Reply at 3), is too limited, and premised upon a distinction without a meaningful difference. *See Perrigo*, 2018 WL 3601229, at *12 (rejecting similar argument). And, in any event, it is well-settled that certain "half-truths" may form a basis for a securities fraud claim. *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239 (2d Cir. 2016). The parties' further disagreement about the proper reading of one of Sundaram's statements regarding competition on earnings calls (*see* Defs' Memo. at 16 n.12; Pl's Memo. at 9 n.9; Defs' Reply at 3 n.3) underscores that there are multiple plausible readings of the statement, thus presenting a fact issue inappropriate at this moment of this litigation. *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 405 (2d Cir. 2015); *see Perrigo*, 2018 WL 3601229, at *12 (reasoning that the question of whether disclosure is required under given set of circumstances is best left to trier of fact).

As such, the misleading nature of Defendants' statements regarding competition is adequately pleaded.

### c. Claims Against Kalb

Finally, Defendant seeks to dismiss claims against Kalb that are based on statements not alleged to have been made by him, such as those made during conference calls. Defs' Memo. at 15 n.11 (citing *Janus Capital Grp., Inc., v. First Derivative Traders*, 564 U.S. 135, 138 (2011)).

Defendants are correct that Kalb cannot be subject to liability for statements he did not make. *Janus*, 564 U.S. at 138. Plaintiffs have failed to respond to this argument, thus abandoning the claim, to the extent they sought to assert it. *Volunteer Fire Ass'n of Tappan, Inc. v. Cty. of Rockland*, No. 09-CV-4622 (CS), 2010 WL 4968247, at *7 (S.D.N.Y. Nov. 24, 2010) ("[W]hen a plaintiff fails to address a defendant's arguments on a motion to dismiss a claim, the claim is deemed abandoned, and dismissal is warranted on that ground alone . . . .") (citations omitted). As such, any claims against Kalb that are premised upon statements not alleged to have been made by Kalb are dismissed.

### 2. Sales and Revenue Figures

Defendants further argue that because Taro's sales and revenue figures are not alleged to have been materially incorrect, they are not actionable, even in the presence of illicit conduct. Defs' Memo. at 17-18. Plaintiffs counter that accurate financial reporting may be actionable if some revenue was derived from illicit activity, e.g., a price-fixing conspiracy. Pl's Memo. at 10 (citing *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 180 (S.D.N.Y. 2010)).

As this court's decision in *In re VEON Ltd. Sec. Litig.*, No. 15-CV-08672 (ALC), 2017 WL 4162342 (S.D.N.Y. Sept. 19, 2017) recently underscored, "a company's misleading statements about the sources of its revenue do not make the company's statements of the revenue figures misleading; rather, liability is limited to the misleading statements themselves." *Id.* at *6 (quoting *In re Marsh & Mclennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 470 (S.D.N.Y. 2006) and disagreeing with *Freudenberg*). In other words, accurately reported income derived from illegal

sources is non-actionable despite a failure to disclose the illegality. *Id.* By contrast, statements "putting the source of those revenues at issue" may be actionable. *Id.* (quoting *In re Marsh & Mclennan*, 501 F. Supp. 2d at 470); *accord In re Mylan*, 2018 WL 1595985, at *5-*6.

Here, many of the statements identified by Plaintiffs are nothing more than a narrative restatement of accurate financial reporting that is not, without more, actionable. Plaintiffs cite a portion of Taro's sales and revenue figures that is not a narrative at all; Plaintiffs refer only to the financial reporting itself. Am. Compl. ¶¶ 337-346. These raw numbers, without further statements regarding the nature of those numbers or their importance to Taro's business, do not sufficiently place the source of the revenue at issue so as to require further disclosure regarding the price-fixing conspiracy.

However, certain other of the statements sufficiently place the reasons for sources of Taro's growth at issue to make further disclosure necessary. For example, Defendants stated that Taro's sales revenue increased "primarily due to price adjustments during the year and increased market share of select products" and that "Taro's sales and earnings growth is attributable to the prudent lifecycle management support product portfolio." Am. Compl. ¶¶ 322, 326; *see id.* ¶¶ 314-16, 337-49. While the growing revenues may have been due to other factors, Plaintiffs allege that a good portion of this growth was attributable to the price-fixing conspiracy. *VEON*, 2017 WL 4162342, at *6. "[W]here a company puts at issue the cause of its financial success, it may mislead investors if the company fails to disclose that a material source of its success is the use of improper or illegal business practices." *In re Mylan*, 2018 WL 1595985, at *6 (quoting *In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 357 (S.D.N.Y. 2008)). When Defendants omitted this information from the statements about the sources of their revenue, it "called into question whether [Taro's] ability to secure favorable pricing in the future was durable and due to a legitimate competitive

advantage, or whether—like all illegal arrangements—it was legally unenforceable and subject to abrupt termination." *In re Braskem*, 246 F. Supp. 3d at 760. As such, Plaintiff has adequately pleaded that Defendants' statements explaining the sources of their income were misleading because Defendants failed to disclose that "[Taro's] income and revenue were inflated as a result of [Taro's] anticompetitive activity." *In re Mylan*, 2018 WL 1595985, at *6.

The same goes for Plaintiff's allegations that Defendants failed to disclose the sources of their price changes and revenue pursuant to certain SEC disclosure requirements. Am. Compl. ¶¶ 347-54. As Plaintiffs argue (Pl's Memo. at 10 n.10), where SEC disclosure rules impose a duty to disclose, for example, the reason for material changes in price, and, by extension, net sales and revenues, on Defendants, Defendants' failure to disclose that information may itself be actionable. *See, e.g.*, *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 71 (2d Cir. 2001) (suggesting that SEC Item 303 duty to disclose existed based upon allegations that defendants failed to disclose a decline in sales constituting a substantial portion of existing trade business). The underlying price-fixing conspiracy is sufficiently alleged to have been "known to management" at the time, and "reasonably likely to have material effects on [Taro's] financial conditions or results of operations." *See Stratte–McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015) (citation omitted) (outlining means by which Plaintiff can make out Item 303 affirmative duty to disclose for purposes of 10(b) claim). None of Defendants' cases are to the contrary. *See* Defs' Memo. at 17-18 & n.18.

For these reasons, the Court concludes that the bulk of the alleged misrepresentations and omissions are adequately pleaded.

B.    *Scienter*

Defendants next argue that Plaintiffs have failed to allege facts giving rise to a strong inference of scienter. Defs' Memo. at 18-24. The Court disagrees.

Under the PSLRA, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). "The requisite state of mind in a Rule 10b-5 action is 'an intent to deceive, manipulate or defraud.'" *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 168 (2d Cir. 2000) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 & n.12 (1976)).

To satisfy the PSLRA's pleading requirements for scienter, a plaintiff must allege facts "(1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns*, 493 F.3d at 99. Plaintiff attempts to proceed under both theories here.

In evaluating whether either of these showings has been made, the court may consider, among other things, whether the plaintiff has alleged that the defendant "(1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000) (internal cross references omitted). When examining these factors, a court must be mindful that the inquiry is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322-23.

Here, considering all of the facts alleged in the Amended Complaint, the inference of each defendant's scienter is "cogent and at least as compelling as any opposing inference one could draw." *Tellabs*, 551 U.S. at 324.

### 1. Individual Defendants

Plaintiffs' scienter allegations as to the individual Defendants are premised upon their well-supported allegations regarding the price-fixing conspiracy, and the regular pricing meetings that

the individual Defendants attended (as corroborated by confidential witnesses). Am. Compl. ¶¶ 197-203, 366.

In *Mylan*, the court rejected Defendants' arguments that the allegations of a confidential witness who worked directly with an individual Defendant and attended pricing meetings with the CEO and CFO (who were also individual Defendants) were together insufficient to establish scienter. 2018 WL 1595985, at *17. Rather, the court concluded that these allegations supported a "strong inference that the individual Defendants either consciously participated in price-fixing, or were at least reckless in ignoring information indicating that price-fixing was occurring." *Id.* The court reached this outcome despite the lack of direct evidence of a price-fixing agreement, reasoning that the court's conclusion that the dramatic price increases would have been against Mylan's corporate self-interest made the inference of Defendants' knowledge of such agreements "at least as compelling as any opposing inference." *Id.* (quoting *Tellabs, Inc.*, 551 U.S. at 314).

This reasoning squares with the allegations at issue in this case, in that, among other things, the confidential witnesses attest to the individual Defendants'—then CEO and CFO at Taro— involvement in pricing decisions, including, but not limited to, attendance at pricing meetings, direct communications with the confidential witnesses regarding pricing, and speaking specifically to pricing issues on earnings calls. Defendants make no attempt to distinguish this portion of the *Mylan* opinion or undermine its bearing on this case. The Court joins the *Mylan* court in its refusal to require allegations that price-fixing be specifically discussed in the pricing meetings at issue, as such a standard would be tantamount to requiring direct evidence of a conspiracy.

Perhaps realizing the close applicability of *Mylan* to the individual scienter analysis in this case, Defendants cite a recent case from another district, *Utesch v. Lannett Co., Inc.*, 2018 WL 3629090 (E.D. Pa. 2018), which dismissed a related securities fraud claim regarding the price

fixing of generic drugs on the basis of deficient scienter allegations. Defs' Supplemental Letter, dated Aug. 17, 2018 at 1-2. However, absent from the *Utesch* court's analysis is any meaningful discussion of plus factors, as here and in *Mylan*. *Utesch*, 2018 WL 3629090, at *5-*6. The *Utesch* court also faulted the confidential witness testimony, which notably did not allege the participation of the individual Defendants at pricing meetings, as "vague[][,]" for a number of reasons that are not present here. *Id.* at *6 (raising concern that one of the individual Defendants only worked at company for short portion of class period, and thus had no authority over pricing decisions). Moreover, despite extensive briefing by the parties regarding *Mylan* (and its predecessor cases), the *Utesch* court made no mention of it in its decision. As such, the Court finds *Utesch* minimally persuasive.

For these reasons, Plaintiffs have adequately alleged scienter as to the individual Defendants.

### 2. Corporate Scienter

Defendants only briefly take issue with Plaintiff's pleading of corporate scienter. Defs' Memo. at 19 n.14. As to corporate scienter, the plaintiff must allege "facts sufficient to create a strong inference either (1) that 'someone whose intent could be imputed to the corporation acted with the requisite scienter' or (2) that the statements 'would have been approved by corporate officials sufficiently knowledgeable about the company to know' that those statements were misleading." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 177 (2d Cir. 2015) (quoting *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195-96 (2d Cir. 2008)). Often, "the most straightforward way to raise such an inference for a corporate defendant will be to plead it for an individual defendant. But it is possible to raise the required inference with regard to a corporate defendant without doing so with regard to a specific individual defendant." *Teamsters*, 531 F.3d at 195.

Here, Plaintiff alleges that Perfetto and Aprahamian, who held high-level positions with Taro, knew about the conspiracy because they attended trade meetings close in time to the price increases, participated in pricing discussions at Taro, and spoke to one of the confidential witnesses about pricing on a daily basis. Defendants complain that Perfetto and Aprahamian are neither named defendants nor are they alleged to have made any of the misstatements at issue. Defs' Reply at 8. However, as a general matter, "the person whose state of mind is imputed to the corporate defendant need not also be the person who made the material misstatements at issue." *Patel v. L-3 Commc'ns Holdings Inc.*, No. 14-CV-6038 (VEC), 2016 WL 1629325, at *15 n.38 (S.D.N.Y. Apr. 21, 2016) (collecting cases); *accord In re Braskem*, 246 F. Supp. 3d 731, 765 n.14. Likewise, courts in this district generally conclude that the scienter of "management level" employees can be attributed to the corporation. *See Thomas v. Shiloh Indus., Inc.*, No. 15-CV-7449 (KMW), 2017 WL 2937620, at *3 (S.D.N.Y. July 7, 2017) (collecting cases). Defendants' further criticisms of the quality of Perfetto and Aprahamian's involvement mirror many of their objections to the scienter allegations pertaining to individual Defendants (*e.g.*, that the confidential witness accounts demonstrate merely that pricing, but not price fixing, was discussed at the meetings at Taro, some of which Perfetto and Aprahamian attended). As such, for many of the same reasons set forth above, the Court rejects these arguments.

For all of these reasons, the Court concludes that Plaintiffs have alleged facts, taken together, that give rise to strong inference of scienter that is at least as compelling as any other opposing inference.

C. *Loss Causation*

Finally, Defendants argue that Plaintiffs do not adequately allege loss causation because, among other things, despite the losses to shareholders that followed two corrective disclosures regarding the frauds at issue, those disclosures pertained to information that was already publicly

available for some time. Defs' Memo. at 24-25. The Court disagrees, concluding that Plaintiffs have adequately alleged loss causation at this stage.

"In any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4). This requirement is referred to as "loss causation" and "is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 172 (2d Cir. 2005) (citation and internal quotation marks omitted).

Since *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336 (2005), there has been a split among the circuits as to whether the loss causation element is subject to the heightened pleading requirements of Rule 9(b) or the ordinary pleading standard of Rule 8(a). The Second Circuit Court of Appeals has yet to weigh in on this debate. *See Loreley Fin.*, 797 F.3d at 182-83 (citing *Acticon AG v. China N.E. Petroleum Holdings, Ltd.*, 692 F.3d 34, 37-38 (2d Cir. 2012)). Under either standard, however, the securities fraud plaintiff's burden is not a heavy one. She must only "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Dura*, 544 U.S. at 347. Ultimately, to prove loss causation, "a plaintiff must show that the loss [was a] foreseeable result of the defendant's conduct (*i.e.*, the fraud), and that the loss [was] caused by the materialization of the . . . risk concealed by the defendant's alleged fraud. *In re Vivendi, SA Sec. Litig.*, 838 F.3d 223, 261 (2d Cir. 2016) (quoting *Lentell*, 396 F.3d at 173) (internal quotation marks omitted, alterations in original).

"[A] misstatement or omission is the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk concealed by the misrepresentations and omissions alleged." *Lentell*, 396 F.3d at 173. Stated differently, when deciding if "the subject of the

fraudulent statement or omission was the cause of the actual loss suffered," the court looks at whether "the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Id.*

Here, Plaintiffs allege that on September 9, 2016, Taro disclosed that the Company and two senior officers had been subpoenaed by the DOJ. Am. Compl. ¶ 355. Its stock fell from a September 9, 2016 closing price of $123.45 to a September 12, 2016 closing price of $119.36. *Id.* ¶ 356. On November 3, 2016, a Bloomberg article disclosed that the first criminal charges would likely be filed by the end of the year, heightening the market's concerns that certain generic drug companies, including Taro (which was specifically mentioned in the article), had been fixing prices. *Id.* ¶ 359. Taro's stock price fell from a November 2, 2016 closing price of $101.05 to a November 3, 2016 closing price of $93.68. *Id.* ¶ 360.

These allegations suffice at the pleading stage for the purposes of loss causation. *See, e.g.*, *In re Mylan*, 2018 WL 1595985, at *18 (concluding that Plaintiffs adequately alleged loss causation where disclosure of suspected price-fixing scheme caused stock drop 6.9% in September 2016 and 1.64% in November 2016) (citing *Lentell*, 396 F.3d at 175). Defendants' argument that Plaintiffs fail to allege loss causation because the market was aware of investigations in the pharmaceutical industry is unavailing. The Complaint makes clear that, until these disclosures occurred, the market was unaware of the extent of Taro's *specific* involvement in a price-fixing conspiracy. Defendants' passing suggestion that the public nature of Taro's substantial price increases somehow meant that the possibility of price fixing was already incorporated into Taro's stock price (Defs' Reply. at 10) is entirely speculative, and further undermines Defendants' arguments regarding the underlying conspiracy. Most of Defendants' arguments, as Judge Oetken concluded in *Mylan*, go to the "robustness of Plaintiff's selection of corrective disclosures" and

are therefore better reserved for a "later stage of litigation, after the aid of discovery." 2018 WL 1595985, at *18.

As such, the Court rejects Defendants arguments regarding loss causation.

## II.    Section 20(a) Claim

Defendants argue that Plaintiffs have failed to state a Section 20(a) claim against the individual Defendants because of the lack of a primary violation, and further that they have failed to state a Section 20(a) claim against Kalb because they have failed to demonstrate that Kalb knew of any price-fixing conspiracy. Defs' Memo. at 25. The Court disagrees.

To state a claim under Section 20(a), a plaintiff must allege (1) a primary violation, (2) control of the primary violator by the defendant, and (3) "that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI Commc'ns*, 493 F.3d at 108. The above analysis reflects the ways in which Plaintiffs have adequately alleged a primary violation against the Defendants. Moreover, Plaintiffs have sufficiently alleged Kalb's knowledge of the alleged pricing scheme through the observations of their confidential witnesses. Among those allegations are that Kalb attended regular pricing meetings and sat on a pricing committee with Perfetto, who is alleged to have attended the trade meetings with Co-Conspirators. Am. Compl. ¶¶ 197-203, 366. Contrary to Defendants' arguments (Defs' Memo. at 21 n.17), that one of the confidential witnesses left Taro a mere three months before the Class Period does not, in light of the totality of the allegations here, undermine the utility of that witness' observations as

to scienter. *See, e.g., In re Scholastic Corp.*, 252 F.3d at 72 (reversing district court's determination that consideration of pre-class data was irrelevant to defendants' knowledge during class period).

For these reasons, the Court rejects Defendants' invitation to dismiss Plaintiffs' Section 20(a) claims.

## CONCLUSION

For all of the foregoing reasons, the Court denies Defendants' motion to dismiss the Amended Complaint in part and grants the motion in part. The Clerk of the Court is respectfully requested to close Docket Entry Numbers 45 and 56.

**SO ORDERED.**

**Dated**: September 24, 2018
New York, New York

_____
**ANDREW L. CARTER, JR.**
**United States District Judge**